590 So.2d 857 (1991)
MISSISSIPPI JUDICIAL PERFORMANCE COMMISSION
v.
James "Petey" HOPKINS, Justice Court Judge.
No. 90-CC-1044.
Supreme Court of Mississippi.
July 3, 1991.
Rehearing Denied December 18, 1991.
Luther T. Brantley, III, Jackson, for petitioner.
Paul S. Funderburk, Tupelo, for respondent.
En Banc.
SULLIVAN, Justice, for the Court:
On January 18, 1990, the Mississippi Commission on Judicial Performance filed a Formal Complaint against Judge James "Petey" Hopkins, Justice Court Judge for the Northern District of Lee County, on its own motion. The Complaint contained six counts against Hopkins. The Commission charged Hopkins with accepting gifts, gratuities and other rewards intended to influence his actions as a justice court judge, violating Miss. Code Ann. § 25-4-105(1) (Supp. 1989), by using his official position to obtain pecuniary benefit for himself, engaging in the practice of ticket fixing, obstructing justice and the enforcement of the criminal laws in the State of Mississippi, violating Canons 1, 2 A, 2 B, 3 A(1), and 3 A(4) of the Code of Judicial Conduct, and violating Section 177A of the Mississippi Constitution of 1890 for engaging in willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.
*858 The Commission filed an Amended Formal Complaint on February 14, 1990. The Complaint was amended to reflect the fact that Hopkins pled nolo contendere to a charge of malicious mischief in the Circuit Court of Lee County on February 8, 1990, and was sentenced accordingly. An additional count was included in the Amended Complaint stating that Hopkins had been adjudicated guilty of the crime of malicious mischief.
Hopkins responded to the Amended Complaint asserting as defenses the doctrines of collateral estoppel, res judicata, and double jeopardy and the failure to assert a claim upon which relief can be granted. Hopkins denied all allegations under the counts except he admitted that he had been adjudicated guilty of the crime of malicious mischief.
The Commission appointed a committee of three to conduct a formal hearing. The hearing was held on May 4, 1990. On August 10, 1990, the hearing panel issued a Finding of Fact and Recommendation. The panel found that Hopkins had violated Canons 1 and 2 A for fixing a ticket and then taking action to conceal that act; Canons 3(A)(1) and 3(A)(4) for the improper dismissal of traffic citations by clerks and other court officials without judicial review and for dismissing criminal charges in exchange for information on unrelated criminal charges; Section 177A of the Constitution for fixing a ticket and then attempting to conceal that act and for failing to sign the court docket on the ticket; and Canons 3(B)(1) and 3(B)(2) for not timely signing his court docket on a regular basis and for allowing court clerks to perform judicial responsibilities. The panel recommended that Judge Hopkins be issued a public reprimand.
The Commission filed Objections to Committee Findings of Fact on September 5, 1990. Hopkins also filed Objections to the findings of the panel. He suggested that a private reprimand would be more appropriate than a public reprimand if he had to be sanctioned.
On September 27, 1990, the Commission entered its own Findings of Fact and Recommendation. The Commission found that Judge Hopkins violated Canons 1 and 2 A for fixing a ticket and attempting to conceal that act, for entering a plea of nolo contendere to the charge of malicious mischief, and for making derogatory remarks about another knowing they would be published; Canons 3(A)(1) and 3(A)(4) for fixing a ticket, for allowing dismissal of citations by clerks without judicial review, and for dismissing criminal charges in exchange for prosecution of unrelated criminal charges; Section 177A of the Constitution for fixing the ticket and attempting to conceal that act and for failing to sign the court docket in that action; and Canons 3(B)(1) and 3(B)(2) for not timely signing his docket on a regular basis and allowing clerks to perform judicial responsibilities. The Commission recommends that Judge Hopkins be removed from office for his conduct.

FACTS
In September of 1987, William Magnusen, a staff officer with the Mississippi Department of Public Safety, took part in an undercover operation in Lee County for a three to four month period. As part of the operation, the Department purchased a bar called "The Hut". The Highway Patrol and the Bureau of Narcotics were also involved in the operation. Magnusen's contact was Mike Bethay with the Bureau of Narcotics.
The purpose of the operation was to pinpoint political corruption, gambling, drugs, auto theft, or in fact anything criminal. In an effort to locate gambling violations, a video poker machine was installed in the bar. Magnusen worked at the bar by himself from November to March, posing as the bar owner. While he was working, he would normally be wired so that he could record any conversations that he might have.
On January 20, 1988, Magnusen had his first contact with Judge Petey Hopkins. According to Magnusen, Judge Hopkins came into the bar with a man by the name of Lonnie Franks about 7:00 p.m. They remained only a short time. Magnusen *859 was introduced to the Judge but had no conversation with him.
The men returned to the bar around 10:00 p.m. This time, Judge Hopkins told Magnusen he would like a word with him. They walked to where no one could overhear them and Judge Hopkins told Magnusen that he did not care what they did at the bar and that if he learned of anything they did, he would not tell anyone. But if they did get caught doing something they should not be doing, they would have to pay the penalty. The Judge also said that he would try to warn Magnusen ahead of time if he would have to hurt them. Judge Hopkins said he would not take a payoff but he would like to have free drinks and free admission. This conversation was not recorded.
After that conversation, Judge Hopkins came into the bar approximately ten to twelve times during the remainder of the time that Magnusen worked at the bar. According to Magnusen, the Judge was given free admission and free drinks on those occasions. However, Magnusen was not always around when Judge Hopkins came in and was not always the one to serve the Judge drinks.
On January 31, 1988, Magnusen went to Judge Hopkins' house. Magnusen was able to record the conversation. However, since only excerpts of the conversation were available at the hearing, the conversation was not admitted into evidence. The purpose for the visit was to make sure that Judge Hopkins knew who Magnusen was and where he could contact him in case of a raid.
To test Judge Hopkins, the Alcoholic Beverage Control Commission was contacted. They went to Judge Hopkins and obtained a search warrant for "The Hut." Judge Hopkins did not warn Magnusen of the search. The warrant was served on February 16, 1988. That same day, Magnusen went to Judge Hopkins' house to talk to him about the warrant. The conversation was recorded and admitted into evidence at the hearing. During the conversation, Judge Hopkins told Magnusen that he would not warn him, but he would not mess him around. The Judge said that his phone had been tapped lately.
Magnusen left the operation in April. Mike Arledge, a Mississippi Highway Patrolman assigned to the Bureau of Narcotics as an agent, took his place. Arledge had worked with Magnusen approximately a month before he took over at the bar. Arledge was aware of the arrangement with Judge Hopkins. In fact, Arledge said that the Judge received free admission and free drinks the times he came into the bar. When another agent joined Arledge later, Arledge explained the arrangement to him.
After Arledge took over, more gambling machines were acquired from a man named Wendy Rogers. The night Wendy arrived with the machines and some pool tables, Judge Hopkins and another man arrived while they were being unloaded. According to Arledge, the Judge and his friend assisted in the unloading.
Arledge began having problems with Mayor Merle Rowan. The Mayor owned some of the gambling machines in the bar and Arledge was going to take Rowan's out and put in those belonging to Wendy Rogers. The lease on the bar belonged to the Mayor so Arledge went to Judge Hopkins on August 22, 1988, to get his advice on the situation. The undercover operation was wrapped up two or three days later.
Arledge used a traffic citation as a means of getting in to see Judge Hopkins. The citation was issued in the alias he was using for the undercover operation, Mike Mitchell. The ticket was issued by Officer Steve Hood of the Mississippi Highway Patrol. Arledge was not actually guilty of speeding but the ticket was used merely as a ruse to get in to see Judge Hopkins.
When Arledge arrived to see the Judge, Arledge told him he needed to talk to him about a couple of things but first he needed to know how much the ticket would be. Judge Hopkins told him it would be $46.00. Arledge then told the Judge that he wanted to talk to him about the lease on the bar. At that point, Judge Hopkins told Arledge to give him the ticket, that he had not recognized Arledge at first because he usually saw him at night. At the end of *860 their discussion, Arledge asked Judge Hopkins what he needed to do with the ticket and the Judge told him, "Nothing." This conversation was recorded and admitted into evidence.
The ticket was also admitted into evidence. Although Judge Hopkins did not do anything with the ticket in the presence of Arledge, the front of the ticket had the words "Not Guilty" written in black ink. On the back of the ticket in blue ink were the words "take under advisement and see britt [sic] before docketing."
Once the undercover operation was over, an affidavit was sworn by Arledge alleging that Judge Hopkins did willfully commit malicious mischief in violation of Section 97-17-67 of the Mississippi Code. The violation was allegedly committed for the time that the gambling machines were brought to the bar. Arledge said, though, that he never saw Judge Hopkins gamble on the machines nor did the Judge ever take a payoff from the machines. In fact, the Judge was never present during a payoff to anyone as far as Arledge knew.
Debbie Berryman, a deputy clerk with the Lee County Justice Court, created the case file on the ticket that was issued to Arledge. The file included the violator's copy of the ticket, the original affidavit, the Commissioner's copy, the State Auditor's copy, and the bench copy. These were all put into a jacket on which was written the docket number, the violator's name, the charge, the date of September 6, 1988, and the disposition of "N/G" with the name of Judge Hopkins. Debbie made those entries from the information given on the violator's copy of the ticket.
Debbie said that the judges usually put the tickets on her desk. She did not know if the statement on the back of Arledge's ticket was there when she received it. The original affidavit was sworn to by Officer Hood on August 23, 1988, in front of Debbie which was the day after Arledge had given the ticket to Judge Hopkins.
The docket page was introduced into evidence showing that the disposition of the ticket was "N/G". The docket was never signed by Judge Hopkins. Debbie said that this meant that the case had never been finally disposed of. Debbie was questioned closely by the panel about the signing of the docket book. When asked if it had been six months since it was signed, Debbie answered, "Maybe." She also answered affirmatively when asked if it was fair to say that some dockets had not been signed since 1988. Debbie indicated that the delay in finally disposing of Arledge's ticket was because the FBI had the ticket.
Another deputy clerk, Sherye Moses, entered the information from the ticket onto the docket page. She took the information from the ticket itself and the original affidavit. The entry was made on August 25, 1988. She did not look at the violator's copy of the ticket.
Officer Hood issued the ticket when he was approached by Mike Bethay and was told that the ticket was needed for the undercover operation. Bethay provided Hood with all the information. At some later date, Judge Hopkins came to Officer Hood with a form entitled "Request of Withdrawal of Affidavit by Arresting Officer and County Attorney." The sheet was filled out except for Hood's signature. Judge Hopkins asked Hood to sign it and Hood did so to keep from causing trouble. Officer Hood said that he had signed these forms at other times but that he normally does it before Debbie Berryman. He could not remember ever having signed one before a judge and had never had a judge present such a form to him asking him to sign it.
Charles Brett, the Lee County Prosecuting Attorney, said that there is an unwritten policy that no tickets will be dismissed without the consent of the county attorney and/or the officer. If an officer wants to dismiss a ticket, he can fill out a form and submit it to a judge. Brett also said it is not unusual to dismiss or reduce charges in return for information about other criminal activity.
When Judge Hopkins brought the ticket to Brett, he told Brett that he had written "not guilty" on the ticket and then had changed his mind and had turned it over on the back and made a notation to see Brett *861 before disposing of it. Brett did not know when either notation was made. Brett said that this was the first time Judge Hopkins had changed his mind about a disposition of a ticket and then asked his advice.
Judge Hopkins has been a Justice Court Judge in Lee County for nineteen years. He said that he never asked for free admission and free drinks from anyone at "The Hut." He said that sometimes he paid admission and sometimes he did not. For every free drink he received, he either offered to pay for it or he tipped the waitress that brought it.
Judge Hopkins explained that when he told Magnusen that he would not mess him around if he was caught doing something illegal, what he meant was that he did not mess anyone around. He said that he told Magnusen he would help him in the sense that he tells people every day who come to him for legal advice that he will help them. He also explained that he told Magnusen his phone had been tapped as an excuse for not warning Magnusen when something happened. He did it because he wanted to remain friends.
On the date that Judge Hopkins and his friend helped unload equipment at "The Hut," Judge Hopkins said that only pool tables were being unloaded. His purpose in going to the bar that day was to buy his friend a beer.
Judge Hopkins said that although he wrote "not guilty" on Arledge's ticket, it was not finalized because he wanted to talk to Brett about it. That he decided to consult with Brett about the ticket was not uncommon, he said, in cases where the holder of the ticket was someone who was a joint owner. The Judge said that they use the tickets to help get information on other criminal activities. In essence, they trade the tickets for information. He said it was a common practice.
Judge Hopkins said that he never accepted any gifts or gratuities from anyone. He repeatedly told the agents that he did not accept payoffs.
Judge Hopkins indicated that he signed the docket about two months ago. He said that Debbie Berryman did not keep up with when exactly the dockets were signed. He did not sign the docket dealing with the ticket because it had only been resolved recently.
Judge Hopkins further indicated that he and Mike Bethay, the Bureau of Narcotics agent who served as a contact during the course of the undercover operation, did not like each other. In fact, the Judge referred to Bethay as an S.O.B. to a newspaper who had called the Judge. He said that his problems with Bethay probably had a lot to do with his problems now.
At the conclusion of the testimony, the Commission moved to amend its Complaint to conform the pleadings to the evidence under Rule 15(b) of the Mississippi Rules of Civil Procedure. The panel allowed the Complaint to be amended to include charges of misconduct in regard to the untimely signing of the docket book and the remark made by Judge Hopkins to the newspaper about Agent Bethay.

STANDARD OF REVIEW
The standard of review which we use in a judicial disciplinary proceeding is stated in Rule 10(E) of the Rules of the Mississippi Commission on Judicial Performance as follows:
Based upon a review of the entire record, the Supreme Court shall prepare and publish a written opinion and judgment directing such disciplinary action, if any, as it finds just and proper. The Supreme Court may accept, reject, or modify, in whole or in part, the findings and recommendation of the Commission. In the event that more than one (1) recommendation for discipline of the judge is filed, the Supreme Court may render a single decision or impose a single sanction with respect to all recommendations.
See Mississippi Judicial Performance Commission v. Coleman, 553 So.2d 513, 515 (Miss. 1989). Under this standard, "[w]e are not bound by those limited scope-of-review rules applicable in appeals generally, rules whereby we are without power to disturb findings of fact if they are supported by substantial evidence." In Re *862 Inquiry Concerning Garner, 466 So.2d 884, 885 (Miss. 1985). However, we give great deference to those findings by the Commission which are based on clear and convincing evidence. Mississippi Judicial Performance Commission v. Walker, 565 So.2d 1117, 1119 (Miss. 1990).

SHOULD THE RESPONDENT BE REMOVED FROM OFFICE PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION?
While we defer to the recommendation of sanctions made by the Commission, we are not bound by them. The sanctions which can be imposed by this Court for judicial misconduct include the removal or suspension of the judge from office, a fine, or public reprimand. See Mississippi Judicial Performance Commission v. Walker, 565 So.2d 1117, 1124 (Miss. 1990) and Miss. Const. Art. 6, § 177A (1890). The "sanction should fit the offense." In Re Quick, 553 So.2d 522, 525 (Miss. 1989); In Re Bailey, 541 So.2d 1036, 1039 (Miss. 1989).
Most Mississippians have primary contact with the law through the justice courts. Since that is so, we have said that although many of these judges have not had any formal training for the office,
[w]hen a person assumes the office of Justice Court Judge in this state, he or she accepts the responsibility of becoming learned in the law. When such a person takes the oath of office, he or she yields the prerogative of executing the responsibilities of the office on any basis other than the fair and impartial and competent application of the law to the facts. The preservation of the rule of law as our last best hope for the just ordering of our society requires nothing less than an insistence by this Court that our justice court judges be in fact what they are in name: judges. (Citations omitted)
In Re Bailey, 541 So.2d at 1039.
Certain factors may be considered as mitigating circumstances in the decision to impose a public reprimand. These include the length and character of the judge's public service, any positive contributions made to the courts and community by the judge, the fact that there is no prior judicial precedent on the issue in question, a judge's commitment to fairness and innovative procedural form, the magnitude of the alleged misconduct, the number of persons who have been affected by the misconduct, and whether the misconduct involved moral turpitude. See Walker, supra, at 1125 and In Re Inquiry Concerning Baker, 535 So.2d 47, 54 (Miss. 1988).
Section 177A of the Mississippi Constitution allows a judge to be sanctioned for, among other things, willful misconduct in office. Willful misconduct within the meaning of Section 177A was discussed in the case In Re Anderson, 412 So.2d 743 (Miss. 1982). We adopted the definition of willful misconduct as given in the North Carolina case of In re Nowell, 293 N.C. 235, 237 S.E.2d 246, 255 (1977).

Willful misconduct in office is the improper or wrongful use of the power of his office by a judge acting intentionally, or with gross unconcern for his conduct, and generally in bad faith. It involves more than an error of judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude, dishonesty, or corruption, and also any knowing misuse of the office, whatever the motive. However, these elements are not necessary to a finding of bad faith. A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith....
Willful misconduct in office of necessity is conduct prejudicial to the administration of justice that brings the judicial office into disrepute. However, a judge may also, through negligence or ignorance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute. (Emphasis theirs).
In Re Anderson, 412 So.2d at 745.
The Canons of the Code of Judicial Conduct which have purportedly been violated *863 by Judge Hopkins are Canons 1, 2 A, 2 B, 3 A(1), 3 A(4), 3 B(1), and 3 B(2). The text of those Canons is as follows:
CANON 1
A Judge Should Uphold the Integrity and Independence of the Judiciary
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.
CANON 2
A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities
A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.
CANON 3
A Judge Should Perform the Duties of His Office Impartially and Diligently
The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:
A. Adjudicative Responsibilities
(1) A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism.
(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.
B. Administrative Responsibilities
(1) A judge should diligently discharge his administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.
(2) A judge should require his staff and court officials subject to his direction and control to observe the standards of fidelity and diligence that apply to him.
The alleged acts of misconduct committed by Judge Hopkins are (1) one instance of ticket fixing and the attempted cover-up, (2) the plea of nolo contendere to the charge of malicious mischief, (3) calling an officer with the Bureau of Narcotics an S.O.B. knowing that the statement was likely to be published in the newspaper, (4) allowing clerks and other officials to dismiss tickets without an adjudication, (5) failing to timely sign the dockets, (6) exchanging tickets for information on other criminal activity, and (7) accepting free drinks and free admission in exchange for favors. Although some of these charges lack merit, we find that clear and convincing evidence has been offered that the overall conduct of Judge Hopkins constitutes willful misconduct in office and is prejudicial to the administration of justice which brings the judicial office into disrepute. We order that Judge Hopkins be removed from office.

*864 SPECIFIC ACTS OF MISCONDUCT WHICH CONSTITUTE WILLFUL MISCONDUCT IN OFFICE AND ARE PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE WHICH BRINGS THE JUDICIAL OFFICE INTO DISREPUTE PURSUANT TO SECTION 177A

A. DISMISSAL OF TICKETS BY CLERKS AND OTHER OFFICIALS
Debbie Berryman, one of the deputy clerks who testified at the hearing, said that generally when an officer wants to dismiss a ticket which he has issued, he will come in and tell the clerk or the judge that he wants to withdraw the affidavit. The officer signs the withdrawal form and the ticket is then sent in as a dismissal. When asked if Judge Hopkins signed the withdrawal form or approved the docketing of the dismissal, Debbie replied that usually she signed them. Officer Hood testified that when he wanted to withdraw an affidavit, he would normally do it before Debbie Berryman.
In Mississippi Judicial Performance Commission v. Cowart, 566 So.2d 1251 (Miss. 1990), Justice Court Judge Richard Cowart was issued a reprimand for allowing clerks and officers to dismiss ninety-two traffic tickets without an adjudication by the Judge. Here, the testimony of Debbie Berryman and Officer Hood offers clear and convincing proof that Judge Hopkins is guilty of allowing clerks and officers to dismiss tickets without his knowledge or adjudication. In fact, this is a common occurrence.

B. FAILURE TO SIGN THE COURT DOCKET
The ticket issued to Arledge was dated August 17, 1988. Arledge talked with Judge Hopkins on August 22, 1988. The disposition of "Not Guilty" was entered on the Commissioner's copy of the ticket on August 25, 1988. The entry in the docket book was made that same day. The docket book was not signed by Judge Hopkins, however, as of the date of the judicial disciplinary hearing, May 4, 1990.
Debbie Berryman said that the docket page had not been signed because the case had never been finalized. At this, the panel questioned her more closely about the signing of the docket book. When asked if it had been six months since the docket was signed, Debbie responded, "Maybe." She also indicated that it was fair to say that some dockets had not been signed since 1988.
Judge Hopkins was also asked about the signing of the docket. He said that he had signed the docket about two months ago and that Debbie did not keep up with when the docket was signed. He said that he did not sign the docket dealing with the ticket because it had only recently been resolved.
Miss. Code Ann. § 9-11-11 (Supp. 1990) and § 9-11-13 (1972), require a justice court judge to sign the docket of the case upon disposition of the matter. Here, the evidence is clear and convincing that Judge Hopkins did not sign the docket in a timely fashion. Some dockets had not been signed since 1988. The practice of failing to sign the docket was condemned in Mississippi Judicial Performance Commission v. Cowart, supra, where Judge Cowart was issued a reprimand, in part, for failing to sign the dockets from the period beginning January 1, 1988, and ending June 9, 1989, although he did sign the dockets prior to filing his Answer to the Commission's Complaint.

C. ALIGNING HIMSELF WITH THE PROSECUTION
Judge Hopkins explained that he had decided to take Arledge's ticket under advisement because he thought that the ticket might be used to gain information about other criminal activities. He said that it "is not uncommon to take tickets under advisement on these joint owners, people that run the joint. We use them constantly to help us find people we're looking for, to help us find stolen cars, dope or whatever, and we do trade out tickets for information." Judge Hopkins said that he works closely with the Bureau of Narcotics and "it is not unusual at all to dismiss felonies or anything *865 else in order to get to somebody at their request."
We have held that a trial judge who was serving as prosecutor at the time of defendant's indictment cannot sit as the judge for the defendant's trial since the judge is acting as both the accuser and the trier of fact. "[A] reasonable person knowing that [the judge] acted as prosecutor ... would certainly question his impartiality." Jenkins v. State, 570 So.2d 1191, 1193 (Miss. 1990). This is also true when the judge takes part in plea negotiations. The assumption by the judge of the part of negotiator "allows a basis for doubting the impartiality of the judge, thus eroding the public confidence in the judicial system and bringing into question the fairness of the administration of justice." Matter of Cox, 553 A.2d 1255, 1258 (Me. 1989). Judge Hopkins, by his own admission, acted as a plea negotiator on many occasions. By doing so, he compromised his impartiality.
The nature of legal proceedings in this country requires every participant in the process, whether he be a police officer, prosecutor, district attorney, or judicial officer, to perform only his allotted function. A judicial officer must not compromise his role as an impartial tribunal by performing a prosecutorial function. To do so undermines the very foundation upon which our legal system is built.
We condemn the practice of judicial officers entering into plea negotiations by dismissing tickets in exchange for information on other crimes. Every litigant, including a traffic violator, is entitled to a fair and impartial tribunal. Compounding the problem is the unwritten policy of this county that no tickets will be dismissed without the consent of the county attorney and/or the officer who issued the ticket. This policy destroys the independent nature of the judiciary.
As we have noted, this Court is
entrusted with the responsibility of ensuring that the criminal justice system of this state works to guarantee that every defendant brought before its tribunals receives a fair and impartial trial. To that end, we must instill in all officers of the trial courts a sense of their own responsibility in preserving our system of justice.
Stringer v. State, 500 So.2d 928, 930 (Miss. 1986). We take the opportunity presented by this case to condemn such practices and to recommend that all judicial officers in those counties in which similar practices occur take immediate steps to ensure that the independence of the judiciary is preserved.

D. STATEMENT TO THE NEWSPAPER
At the hearing, Judge Hopkins was questioned about his relationship with the Bureau of Narcotics. The following exchange took place:
Q. Do y'all have a separate county unit?
A. Yes, sir, we had a metro vice and Lee, Tupelo metro vice, and they split up sometime back, and I've got a good working relationship with the county vice, and really, I have a good working relationship with the state narcotics, except Mike Battha, [sic] and I will help him if I had to, but I wouldn't want to.
Q. You wouldn't want to, huh?
A. I don't like him, and he don't like me.
Q. You made reference to him in the news article, I believe?
A. Yes, sir, and that's what he is.
Q. Pardon?
A. And that's what he is, exactly what I called him.
Q. What's that?
A. An SOB. That's probably got a little bit to do with this ongoing thing here.
By Judge Hopkins' own testimony, the proof is clear and convincing that he did make such a comment to the newspaper. While not specifically addressing the question of whether such a comment made by a judge to a newspaper is improper, we have said that a judge should "display the temperament and impartiality and learning and competence that are synonymous with the idea of the judge in a society that accepts *866 and is governed by the rule of law." In Re Bailey, 541 So.2d 1036, 1040 (Miss. 1989).

CONCLUSION
Judge Hopkins is guilty of misconduct in the performance of his judicial duties. The fact that several attorneys and law enforcement officials testified as to his good character does not diminish the fact that Judge Hopkins, by his willful misconduct, brought his judicial office into disrepute. By clear and convincing evidence, we find that Judge Hopkins has violated Canons 1, 2 A, 3 A(1), 3 A(4), 3 B(1), and 3 B(2) of the Code of Judicial Conduct and Section 177A of the Mississippi Constitution.
Judge Hopkins denies that he committed any wrongdoing. He instead offers explanations and excuses for every act. Judge Hopkins has been a Justice Court Judge for nineteen years. That is more than enough time for him to have learned what is improper behavior from a judge. The acts of misconduct by Judge Hopkins, together with his presence in a place where he, as a judge, had no business being, brings the judicial office into disrepute. An isolated incident of misconduct may have justified a public reprimand. However, because of the number of offenses committed by Judge Hopkins and his denial of any wrongdoing, we adopt the recommendation of the Mississippi Judicial Performance Commission and order that Judge James "Petey" Hopkins be removed from the office of Justice Court Judge for the Northern District of Lee County, Mississippi.
JUDGE JAMES "PETEY" HOPKINS IS HEREBY REMOVED FROM THE OFFICE OF JUSTICE COURT JUDGE FOR THE NORTHERN DISTRICT OF LEE COUNTY, MISSISSIPPI.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, PITTMAN and BANKS, JJ., concur.
DAN M. LEE, P.J., concurs in part and dissents in part by separate written opinion joined by McRAE, J.
DAN M. LEE, Presiding Justice, concurring in part, dissenting in part:
The Mississippi Judicial Performance Commission appointed a three-person tribunal, consisting of Judge Frank M. Coleman, Mr. Robert D. Church and Judge C.E. Robertson, to hear the proceedings in this matter on May 4 and August 10, 1990. In a solemn judicial atmosphere, the tribunal heard witnesses for both the Judicial Performance Commission and James "Petey" Hopkins, and observed the witnesses' demeanor and facial expressions, all "in the heat of courtroom battle," as it were.
That tribunal issued a written finding of fact and recommendation, finding that the Commission had failed to produce sufficient proof in support of Counts I, II, IV, and V of the Amended Complaint and dismissed those counts for that reason; however, the tribunal found that the Commission had sufficiently proven Counts III and VI and further found that Hopkins had violated Canons 1 and 2A for fixing a ticket and then taking actions to conceal that act; Canons 3(A)(1) and 3(A)(4) for the improper dismissal of traffic citations by clerks and other court officials without judicial review and for dismissing criminal charges in exchange for information on unrelated criminal charges; Section 177A of the Constitution for fixing a ticket and then attempting to conceal that act and for failing to sign the court docket on the ticket; and Canons 3(B)(1) and 3(B)(2) for not timely signing his court docket on a regular basis and for allowing court clerks to perform judicial responsibilities for these transgressions. The tribunal recommended that Judge Hopkins be issued a public reprimand.
The full Commission, however, entered its own Findings of Fact and Recommendation, finding clear and convincing evidence to support Counts III, V, and VI, and finding that Hopkins violated several Canons and Constitutional provisions, as set out in the majority opinion. The Commission recommended that Judge Hopkins be removed from office, a recommendation which the majority now upholds without any discussion or credence given to the recommendation of the three-person tribunal.
*867 While noting that conduct which the majority says justifies the maximum penalty in this case, I also note that the majority concludes that some of these charges lack merit, although which charges are not specified. However, the three persons comprising the tribunal, who were acquainted with the area and the entire situation, found that Judge Hopkins was guilty of only Counts III and VI, but not of Counts I, II, IV or V. With such split of opinion in the determination of Judge Hopkins' conduct and ultimate fate, it would seem that some deference, or at least acknowledgement, should be given to the findings and recommendations of the tribunal.
As this Court has said in other cases, judges and juries who have heard the testimony, observed the demeanor and facial expressions of the witnesses at trial (and in this instance the tribunal) are in a far better position to weigh and judge witnesses and their testimony than is a reviewing body which has only the cold printed record from which to read. See, e.g., Roberts v. State Farm Mut. Auto. Ins., 567 So.2d 1193, 1196 (Miss. 1990); Johnson v. Black, 469 So.2d 88, 90 (Miss. 1985).
In the Judicial Performance arena, this Court gives great deference to findings by a Tribunal which are based on clear and convincing evidence, Mississippi Judicial Performance Commission v. Walker, 565 So.2d 1117, 1119 (Miss. 1990), even though we are not specifically bound by the scope of review applicable in general appeals. In Re Inquiry Concerning Garner, 466 So.2d 884, 885 (Miss. 1985). We might do well to pay more attention and give more deference to the tribunal's recommendation in this case to issue a public reprimand.
The majority mentions in Part C that the judge would seemingly align himself with the prosecution and I agree that such a practice should never exist; therefore, I concur in that part of the majority which condemns this practice.
McRAE, J., joins this opinion.