680 So.2d 180 (1996)
MISSISSIPPI COMMISSION ON JUDICIAL PERFORMANCE
v.
Floyd DODDS.
No. 94-CC-00453-SCT.
Supreme Court of Mississippi.
August 8, 1996.
*182 Luther T. Brantley, III, Jackson, for appellant.
Thomas H. Comer, Jr., Comer & Jenkins, Booneville, for appellee.
EN BANC.
BANKS, Justice, for the Court:
We are once again confronted with a judge accused of transgressing the Code of Judicial Conduct. After having examined the record we conclude that the recommendation by the Mississippi Commission on Judicial Performance that Floyd Dodds be removed is a proper one and should be accepted.[1]

I.
On April 9, 1993, the Mississippi Commission on Judicial Performance (Commission) filed a complaint charging Judge Floyd Dodds (Dodds), Justice Court Judge for the Northern District of Prentiss County, Mississippi, with judicial misconduct. An amended complaint was filed four weeks later. On November 29, 1993 a hearing was held before the Commission. Evidence as to several instances of Dodds' judicial misconduct was presented at trial.

The Matter at Grace Baptist Church:
Reverend Richard Owens, Pastor of Grace Baptist Church, testified that in August or September of 1992, certain members of the congregation led by David Denson (Denson) and James Moore (Moore) attempted to oust him as pastor during a business meeting. Owens testified that Denson and Moore obtained a temporary restraining order from Chancery Court Judge Timothy Irvin after they alleged that he was destroying the church. Owens testified that the restraining order prohibited him from going onto church property, however, the order was dissolved on October 8. Owens stated that he was thereafter arrested for trespassing when he returned to the church by a warrant signed by Dodds pursuant to a complaint filed by Denson. He testified that the arresting deputy escorted him to Dodds' office where Dodds set a bond of $1,000. Although Dodds *183 was told that the restraining order was dissolved, Owens testified that Dodds did not want to discuss the matter.
Owens testified that when he returned to the parsonage to remove his belongings, he was met by threats and hollering by the opposition. He testified that when he went to the court to press charges, Dodds was in a meeting with Denson and refused to issue any warrants against the dissidents. He testified that he did file affidavits for warrants with Judge Caver.
Owens testified that he was arrested again on October 10 pursuant to a warrant issued by Dodds. He testified that when he arrived in Dodds' office, he received a copy of a temporary restraining order again forbidding him from going on church grounds. Prior to Dodds handing him the order in his office, Dodds testified that he had no notice of the order. On October 11 and November 3, Owens testified that he was arrested again in violation of the order, pursuant to a warrant issued by Dodds.
Owens testified that during his November 3 arrest, Dodds talked to him privately in a room in the sheriff's office and bond was posted. Owens testified that he taped the conversation. The tape was heard and introduced into evidence as exhibit 9.
On November 4, another disturbance occurred at the church. Owens testified that he was conducting Wednesday night service when he was again arrested by a deputy. He testified that Dodds arrived at the church and talked to Moore, Owens' wife, the deputy and others. Owens was thereafter taken to jail, and he testified that four charges were filed against him. He testified that when Dodds arrived at the jail, Dodds told him that he would let Owens out and sign the bond if Owens promised not to go back to the church until the case was settled. Owens testified that after he told Dodds that he couldn't make any promises because he lived in the parsonage and that, therefore, the situation would have to be settled in court, Dodds told him to go back to his cell. As a result of this incident, Owens testified that he stayed in jail approximately twenty hours.
Owens testified that on November 4, he attended a hearing for being in contempt of court for violation of the restraining order. He testified that Dodds and Judge Caver heard the cases and Dodds extended the restraining order 30 days.
Owens testified that Dodds spoke to him again when he went to obtain some paperwork on November 16 from the clerk's office informing him that the order applied to both sides of the dispute. Owens testified that he taped this conversation and the tape was introduced as exhibit 14.
Owens testified that in February 1993 he moved and nothing was ever done about the charges filed against him.
Floyd Dodds testified in his own behalf at trial. He stated that he took office October 9, 1991. He denied advising Owens that he could not file charges against the Moores or the Densons. He said that on October 10, Denson along with an attorney named Langston came to his office and told him that they needed an order to keep the preacher out of the church, and wanted him to issue a warrant. He testified that as he had "just been to school on that" and was unsure if he had authority to issue a warrant. He testified that he checked his books from the Mississippi Judicial College and from them understood that the Justice Court could issue a restraining order for five days. He admitted that the books to which he referred indicated that he had authority to issue a restraining order only in a domestic violence case, but stated that, because he was a new judge, he could have misunderstood the provision. He further stated that attorney Langston assured him that it was the proper thing to do and he issued the order based upon being told that somebody would drastically be hurt the next day at services if something wasn't done. Dodds testified that he issued a Justice Warrant and on the bottom of the warrant, he penciled in an order that Owens was excluded from church grounds except from the parsonage. He never gave Dodds a hearing prior to issuing the order.
Dodds testified that on November 4, he received a call from an employee at the sheriff's department stating that the church members were fighting and needed him at *184 the church. Although he knew that he had no business going to the church, he went. He left after learning that Moore and Owens were in the police car and the situation was under control. He testified that going to the church was a bad mistake and that if he had it to do again, he would stay at home.
Dodds admitted that his handling of the church matter was a bad judgment call on his part, and that it was a bad situation of which he did not intentionally wish to get involved.
Franklin Oswalt also testified at trial. He testified that on October 8, 1992, he posted a $20 bond for Owens by check. He testified that he gave Dodds the check because he was the only one at court after five o'clock. He testified that Dodds did not give him a receipt.
Randy Tolar, investigator with the Prentiss County Sheriff's Department, also testified at trial. He testified that he was dispatched to the church on occasions and stated that he was concerned about the safety and welfare of the people in the church because they were acting like a bunch of children. Tolar also testified that after the November 4 altercation at the church, he was present when people were filing charges at the sheriff's office. He testified that a woman named Kim Jackson was charged and stated that Dodds offered to pay her bond when she stated that she didn't have any money to pay it.

Accepting and Loaning Money Without Legal Authority:
Dodds was called as a witness to answer charges that he accepted fine money and loaned bond money to defendants without authority to do so. As evidence that Dodds accepted fine money, the Commission introduced receipts indicating that Dodds received money paid by litigants. Dodds offered an explanation for some of the charges. There were others of which he had no recollection.
The Commission introduced a receipt indicating that Dodds paid a $20 bond fee for H.F. Sanders. Dodds testified that Sanders was charged with practicing as a CPA without a license. He testified that the clerk informed him that Sanders did not pay the bond fee, and in order to prevent the clerk from coming out short, he gave her $20 with the intention of collecting the money back from Sanders. Sanders' secretary later brought him the money.
The Commission also introduced a receipt for a $100 bond fee written to Dodds for Randy Hale. Dodds testified that Hale gave him bond money and he gave it to the clerk. The Commission introduced a receipt indicating that Dodds paid a $1 bond fee for William Moses. Dodds testified that the clerk came to him and requested that he give her $1 for Moses' bond because she gave Moses his receipts and completed the transaction prior to realizing that he owed a $1 bond. He stated that he gave her the $1 to balance her books.
The Commission introduced exhibit 28, a receipt reflecting payment received from Dodds on behalf of defendant Mike Wyatt. Dodds stated that he did not remember receiving the money and giving it to the clerks. The Commission introduced receipt 29, a receipt indicating that Dodds received $20 for Theresa Ballard. Dodds testified that Ballard was charged with contempt of court for not paying the ticket for an expired tag. He testified that Ballard's mother paid the $20 bond fee around seven o'clock in the evening to Constable Michael who placed it in the clerk's desk. Dodds later testified that he didn't recall if he or Michael was given the money, but Michael was the person who put it in the clerk's drawer. Dodds testified that he was familiar with Michael's testimony that he did not do it, but stated that Michael was mistaken.
The Commission introduced exhibits 31 and 32 which had Dodds' signature on it and indicated that Dodds received money from Allan Drake. However, Dodds did not recall receiving the money. In the case of Troy Martin, who was charged with breaking and entering and grand larceny, Dodds did not know why a receipt for $70.50 was issued in his name. The Commission introduced exhibits 35, 36, and 37 indicating that Dodds received fine money for David Moore. Dodds testified that Moore mailed the Justice Court a check for his fine. He stated that Tammy (the court clerk) brought the mail back to his office where he read the *185 letter from Moore and gave her the check in everyone's presence. He was not given a receipt.
It was thereafter stipulated that Dodds set a bond in the Willis case and the Mayhall case. In both cases he stipulated that he loaned bond money to the defendants so that they could be released from jail.
Dodds testified that he has read the code and fully understood that judges could not handle money under any circumstances and he did not make it a practice to accept money.
Dodds testified that in the case of Tommy Willis, Willis was shaking in his cell when he was brought to jail on a warrant issued for contempt of court. He testified that Willis was suffering from cirrhosis of the liver and, because he was indigent, Dodds loaned him the $20 fine fee.
In the case of Walker Mayhall, Dodds testified that Mayhall was arrested on a contempt warrant. He stated that he loaned Mayhall the $20 fine fee because Mayhall was indigent and might lose his job if he remained in jail.
Bobbie George, Justice Court clerk, testified that when someone comes in to pay a fine or costs, procedurally, one of the clerks accepts the payments, creates the receipt, updates the file and closes the case. She testified that when money is given to the clerks, the receipt has the defendant's name on it and the name of the person who paid it. However, she testified that the clerks don't follow this procedure 100 percent of the time.
George testified that in the incident where she received $1 from Dodds for the William Moses case, she asked Dodds if there was something she could do to retire the $1 balance that was on the case. She testified that Dodds said that he would just pay it and she wrote a receipt to him. She testified that he did it as a favor to her.
George testified that in the Mike White case, White dropped an envelope off addressed to Dodds with a money order in it. She stated that Dodds opened the envelope, and gave the money order to her after which she gave him a receipt.
George stated that she did not recall how she received funds for Theresa Ballard or Mr. Hale, however, she receipted Dodds with the money for some reason. Randy Hale also testified at trial. He stated that in January, 1991, he received a ticket for speeding and driving on a suspended license. He testified that his mother paid a $100 fine fee to Dodds and Dodds handed the money to another man in the sheriff's department.
Clyde Hopkins also testified at trial. He testified that his daughter, Diane Ashmore, and his son-in-law, Timothy Ashmore, were charged with possession of alcohol in December 1992. He testified that in his attempt to get them out of jail on bond, he wrote a check which was not accepted. He then stated that he asked Dodds for the cash money to pay the fine and wrote Dodds a check in that amount.

Execution of Judgment:
Dodds testified that Troy Harrison filed a civil action against Bobby Agnew for $660. Because Agnew failed to appear in court, Dodds testified that a default judgment was entered against him and Harrison paid the costs for the suit. Dodds testified that Harrison thereafter came to see him regarding filing a execution to pick up a horse. Dodds testified that he gave Tammy Coleman, court clerk, a blank form and told her to issue an execution for him, however, she refused to do so. After Coleman's refusal, Dodds testified that he signed the form and began to fill it out when he called prosecuting attorney, John Hatcher, and informed him of the situation. Hatcher advised him to get an abstract copy of the record, give it to Harrison, and let him carry it to the circuit court clerk who would then handle the matter. Dodds testified that he thereafter crossed his signature out and did as he was advised.
Although it was her normal duty to fill out paper work such as the execution, Coleman testified that she did not sign the execution form because it was blank, court fees had not been paid, and an abstract of judgment had to first be enrolled in the circuit clerk's office prior to an execution, and Harrison was not present.
Janelle Lowrey, Deputy Circuit Clerk, testified that Troy Harrison came into her office *186 to have the execution notarized. She testified that when the form was brought in, Dodds' signature was not scratched through and the only thing she did with the form was to notarize Dodds' signature. She testified that she did not file anything for Harrison or collect any fees from him.
Officer Randy Tolar testified that Harrison brought the execution to the sheriff's department and he served the execution. Tolar stated that Dodds' signature was crossed out on the form when he received it. Harrison also testified at trial. He stated that he did not pay any costs at the Justice Court or the circuit clerk's office to file the execution. He further testified that Dodds probably scratched his signature out after calling the county attorney, but was that he was unsure as to that.

Improper Handling of DUI Charge:
Dodds testified that on February 18, 1992, a guilty plea was entered in open court by Wilbert Bridges, who was originally charged with driving while his license was suspended for DUI and DUI, second offense. His blood-alcohol level was .14 percent. Dodds testified that the county attorney intended to negotiate to dismiss two charges and have Bridges plead guilty to possession of beer and whiskey. Dodds testified that Bridges was fined on the lesser offense because there was a problem with the arresting officer seeing him drive the car. The file presented at trial indicated that there were affidavits for the two original charges, but no affidavit for the lesser reduced charges.
Dodds testified that he was familiar with the statute that prohibits the reduction of a DUI to a lesser charge where there is a blood alcohol test given, however, because the incident occurred during the beginning of his tenure, he was not well versed with the statutes.
Patilda Maness, Deputy Clerk, also testified at trial. She stated that the county attorney approached the judge's bench and informed him that he decided to change the DUI charge to possession of alcohol. She stated that when she handed an affidavit to Tom, the officer, to sign, he left the court. Maness testified that after court, she told Dodds that she needed an affidavit and asked him what she was to do with the fine money paid by Bridges as the original charge had not guilty written on it. She stated that Dodds told her to get the officer to sign it and ordered her to take the money after she informed him that the officer was not going to sign the affidavit.
Maness testified that she asked the officer several times for an affidavit, but he refused, informing her that he was not going to charge a man for something that he did not do. She stated that she thereafter placed a note on the bottom of the file indicating that Dodds ordered her to take the money.

Ticket Fixing:
Of the thirty-two allegations of ticket fixing, the parties entered into a stipulation that no evidence would be presented as to cases involving Rickey Cartwright, Samuel Grisham, and Kevin Franks. Thus, twenty-nine cases remained before the court.
In the case of Bobby Chittom, who was charged with speeding, Dodds testified that he adjudicated the case and sent Chittom to defensive driving school. He testified that the state recommended that he do this for first time offenders under twenty-one in order to encourage them not to speed.
In the case of Johnny Ricks, who was charged with having an expired tag, Dodds testified that Ricks showed him a registration receipt and a statement from the tax assessor indicating that the penalty had been excused on it. He testified that he dismissed the case based on the information without a hearing.
In the case of James Jernigan, Dodds stipulated that Jernigan was not tried in open court. He testified that Jernigan came to his office and informed him that he lived in Tennessee and traded his car in Mississippi for another car. He stated that Jernigan pulled the tag off of his car and carried it back to Tennessee to get credit for it. Dodds testified that Jernigan signed a statement and he dismissed the charges.
In the William McDonald case, Dodds testified that although no trial was held, McDonald was found not guilty of driving without a license. Dodds testified that at the *187 time McDonald received the ticket, his license was valid because he called the sheriff's department and they ran a check on the license.
It was stipulated that no trial was held in the case of Tommy Storey. Dodds testified that Storey was charged with not having a tag and with an expired motor vehicle inspection. He stated that Storey informed him that the car was a dealer vehicle and the dealer was doing work on it, therefore, the car had a dealer's tag on it. Dodds dismissed the case based on the conversation with Story and a corroborating statement from the dealer. It was stipulated that the Garner Fields case was not heard in open court. Dodds testified that Fields was ticketed for having an expired tag. She brought in the tag and her case was dismissed.
It was stipulated that the James Wagner case was not heard in open court. Dodds testified that Wagner informed him that his car was in the shop and he was driving his father's car. Although the car had a Missouri license plate, he stated that the tag was valid and unexpired, therefore, he dismissed the case.
It was stipulated that the Jimmy Smith case was not heard in open court. Dodds testified that he didn't have any choice but to dismiss Smith's speeding ticket because the officer died and was thus unable to attend trial. He stated that the county attorney told him not to prosecute the case. Charges against Laurie Shockley were dismissed for the same reason.
Dodds testified that Marie Kanoe was charged with improper equipment because her brake lights did not function. Dodds stated that the case was dismissed on proof that she fixed the light and on recommendation by the officer. Dodds testified that he recognized that this was wrong and stated that the office is more strict now.
Dodds testified that Evelyn Evan was charged with an expired tag. He stated that the case went to court and she was found guilty. After her court date, Dodds testified that Officer Michaels informed him that the car was purchased within the seven day limit and he dismissed the ticket.
Dodds testified that Michael Chandler was charged with failure to dim headlights and stipulated that the case was not held in open court. He did not remember why he dismissed the charges.
Dodds testified that Leslie Pope was charged with having an improper tag and stipulated that his case was not held in open court. Dodds testified that Pope informed him in his office that he had just moved to Mississippi and did not have funds to purchase a tag, however he would do so as soon as he got the money. Dodds testified that he therefore dismissed the case.
Dodds testified that Terry Tays was charged with driving with a suspended license and possession of beer. He stipulated that her case was not held in open court. Although there was no evidence in the file, he testified that the officer in the case probably told him that he could suspend the fine if Tays paid the suspended license fine.
Dodds testified that Joseph Moore was charged with driving with a suspended license and with an expired tag. He stated that this case was not held in open court. Dodds testified that Moore paid the expired tag ticket and he dismissed the suspended license charge because he felt that the license was valid as Moore sent a financial responsibility certificate to the Department of Public Safety prior to receiving the ticket.
Dodds testified that Randall Alred was charged with having an expired tag and stipulated that the case was not held in open court. After Alred brought in the title application and the tag receipt, Dodds testified that he dismissed the case.
Dodds testified that Carl Billups was charged with driving with no license and it was stipulated that his case was not held in open court. Dodds testified that Officer Stevens informed him that Billups was driving on a learner's permit and asked him to consider the fact that he was only driving to a neighbor's house. Dodds dismissed the case.
Dodds testified that Karen Grisham was charged with an expired tag. He stated that Officer Green signed an affidavit wishing to dismiss the charges and he did so.
*188 The remainder of the ticket fixing charges testified to involved non-moving violations of vehicle inspections, driving without a tag and driving on suspended license. In reference to these cases, Dodds admitted that he entered into ex parte communications concerning the handling of the tickets and dismissed the cases without a hearing. Dodds testified that in all of the cases, he had some proof of the party's innocence such as proof of purchase of a tag or proof of purchase of an automobile where the time had not expired. He testified that so many cases came into the court that there would have been a tremendous amount of work if the cases weren't handled as they were. He further testified that he would take such cases to court in the future.
Dodds and Judge Caver entered an order concerning courthouse procedures. The order provided that all cases would be handled in open court and that judges are prohibited from communicating with parties in pending cases. Dodds also admitted that on various occasions he had reduced fines as a result of ex parte communications with the party and testified that he felt that he had to talk to the parties when they came in to see him. Dodds testified that he reduced a $35 fine by $20 for Pamela Michael because she had four children and had problems making ends meet. He also testified that he reduced $20 from James Kendrick's fine because Kendrick informed him that he had a heart operation and was having a hard time.
Although Dodds testified that he reduced a speeding fine by $20 for Kale Kuehn, he did not recall the circumstances behind the reduction. He also admitted to reducing a speeding fine for Bobby Lambert by $20, a fine for running a stop sign by $10 for Patricia Huddleston, and a speeding fine for Jerry Carpenter by $10.

Interference with the Rotation of Cases:
Although the complaint lists allegations of Dodds adjudicating forty cases assigned to Judge Caver, it was stipulated that Dodds handled twenty-six of those cases. Counsel for the Commission accepted the stipulation and did not present any evidence on the other contested counts. Evidence, however, was presented on a case involving his son, Charles Dodds, and another case involving his son's friend, Warren McMillian.
Dodds testified that Charles Dodds was charged with driving with an expired tag. He stated that because the case involved a close relative, he recused himself and asked Judge Caver to handle the case. Dodds testified that Judge Caver reduced the expired tag to $57.50 without his request.
Dodds testified that a man named Warren McMillian, his son's friend, was charged with speeding. He testified that the case was assigned to and adjudicated by Judge Caver. He stated that he neither talked to McMillian nor requested that the issuing officer of the speeding ticket dismiss the charge. Dodds' testimony was contradicted by Patilda Maness, court clerk, who testified that McMillian came into the office two or three times and she was present when Dodds told Judge Caver that he had spoken to the highway patrolman about the case.
McMillian testified that he never asked Dodds to talk to the officer about the ticket. He further testified that he only talked to Dodds to find out who would be his judge in the case. In addition, he stated that he went to the court four times for the case and on three occasions the officer did not show up; the fourth time the case was dismissed.
Dodds admitted that he handled Judge Caver's cases, but testified that he and Judge Caver were advised by the county attorney to handle each others cases when either of them were out of pocket. Dodds' testimony was supported by Patilda Maness and Bobbie George.

Obstruction of Judicial Process:
Dodds testified that on or about April 30, 1993, the clerks changed the locks on the file cabinets within the Justice Court. He testified that because the clerks were locking the files, he wouldn't have access to the files on the weekend in order to prepare his answers to charges brought by the Commission. He stated that he asked the county attorney, Hatcher, to draft an order so that he could have access to the files on the weekend and Hatcher did so after Dodds took him a copy of the complaint.
*189 Dodds conceded that the order was directed to Bobbie George, the clerk; deputy clerks Tammy Coleman and Patilda Maness; constables Bud Michaels and Billy Brassel; and any others to whom the order may be applicable. The order requested all official and unofficial evidence, records, proceedings, and depositions. The order further provided that failure to abide by the order by all affected should be grounds for contempt or other remedial measures. Dodds testified that some of the wording in the order was a mistake as he was trying to distribute the order in a hurry and Hatcher may have misunderstood some things that he said.
Bobby George testified that up until April 29, 1993, Dodds and Judge Caver had access to the files in the clerk's office twenty-four hours a day, seven days a week without a check out system. She testified that putting locks on the doors came unexpectedly to Dodds and Judge Caver because she had not given them any notice.
George testified that on April 30, Dodds handed her an order directing her to give him different files, records, and evidence to cases being investigated by the Commission. She stated that she wrote a letter to the Commission indicating these facts. She further testified that the files were later turned over to his attorney and an agreement was worked out by which he could remove the files from the court to his office.
George further testified that after Dodds laid the order on her desk, he neither threatened her nor said anything about the order. She testified that he never took any action against any of the clerks to make them comply with the order. This testimony was supported by Patilda Maness and Tammy Coleman.

Opinion of the Commission:
On November 29, 1993, the Commission rendered its decision. In the matter of Grace Baptist Church, the Commission found that Dodds acted in excess of his authority as he had no authority to impose a restraining order except in specified circumstances of domestic abuse. The Commission further found that ignorance of the law is no defense for justice court judges.
The Commission also found that Dodds made unilateral and unlawful decisions on many occasions by taking money from litigants, bypassing the justice court clerk, and by acting as a "loan company" to defendants who could not make bond. The Commission found that these actions were an unlawful usurpation of powers whether done in good faith or not.
The Commission also found that Dodds acted outside his authority when he signed the execution judgment and attempted to have it executed without filing it with the circuit court and without court costs being paid.
The Commission further found that Dodds acted outside his authority when he reduced charges of DUI and adjudicated the case without an underlying affidavit, as nothing in the statutes allow for reduction of a DUI charge to possession of beer and whiskey. In addition, it was found that Dodds disposed of thirty-two cases by dismissal or not guilty verdicts commonly referred to as the practice of ticket fixing. The Commission found that the cases were the result of unlawful ex parte communications and were not resolved in court as required by law.
The Commission further found that Dodds violated §§ 9-11-27 and 99-33-2 of Miss. Code Ann. when he interfered with the rotation of cases belonging to Judge Caver on at least forty occasions. In addition, the Commission found that Dodds violated Canon 2B of the Code of Judicial Conduct when he attempted to influence Judge Caver in cases involving his son and McMillian.
The Commission found that Dodds inappropriately engaged in ex parte communications during his tenure in such a manner that his judgeship was one which brought the entire administration of justice in disrepute.
The Commission also found that Dodds attempted to intimidate the clerical staff in performance of their duties and as potential witnesses against him when he ordered them to deliver copies of all statements relating to the cases against him within seventy-two hours. The Commission found that whether the order was issued as a result of bad judgment or in an overt attempt to interfere *190 with the complaint against him, Dodds seriously violated the law when he issued the order. As a result of Dodds' actions, the Commission found that Dodds should be removed from office and assessed costs.

STANDARD OF REVIEW
The appropriate standard of review for a judicial disciplinary proceeding is derived from Rule 10(E) of the Rules of the Mississippi Commission on Judicial Performance which provides:
Based upon a review of the entire record, the Supreme Court shall prepare and publish a written opinion and judgment directing such disciplinary action, if any, as it finds just and proper. The Supreme Court may accept, reject, or modify, in whole or in part, the findings and recommendation of the Commission. In the event that more than one (1) recommendation for discipline of the judge is filed, the Supreme Court may render a single decision or impose a single sanction with respect to all recommendations.
Miss. Com'n on Jud. Perf. v. Chinn, 611 So.2d 849, 850 (Miss. 1992), citing Miss. Jud. Per. Com'n v. Hopkins, 590 So.2d 857 (Miss. 1991). Although this Court is not bound by the Commission's findings, they are given great deference when based on clear and convincing evidence. Chinn, 611 So.2d at 850.

I. DID DODDS' CONDUCT CONSTITUTE WILLFUL MISCONDUCT IN OFFICE AND CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE WHICH BRINGS THE JUDICIAL OFFICE INTO DISREPUTE PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION (1890), AS AMENDED?
The Commission argues that Dodds willfully took official actions while acting as a justice court judge without any lawful authority which violated Canons of the Code of Judicial Conduct of Mississippi Judges and Article 6 Section 177A of the Mississippi Constitution (1890), as amended. Section 177A provides:
On recommendation of the commission on judicial performance, the supreme court may remove from office, suspend, fine or publicly censure or reprimand any justice or judge of this state for: . .. (b) willful misconduct in office; (c) willful and persistent failure to perform his duties; ... or (e) conduct prejudicial to the administration of justice which brings the judicial office to disrepute...
The Commission argues that willful misconduct engaged in by Dodds include: entering orders without any authority in the case of Grace Baptist Church, accepting money without authority, acting outside his legal authority to sign an execution of judgment, improper handling of DUI charges, and interference with the rotation of cases. The Commission argues that Dodds' actions constituted willful misconduct prejudicial to the administration of justice which brings the judicial office into disrepute.
This Court defined willful misconduct prejudicial to the administration of justice in the case of In re Anderson, 412 So.2d 743, 745 (Miss. 1982), where a judge charged traffic violators a greater fine than that officially reported. He thereafter reported receipt of the lesser sum to the county and retained the remainder for his own use. Citing In re Nowell, 293 N.C. 235, 237 S.E.2d 246, 255 (1977), this Court quoted:
Willful misconduct in office is the improper or wrongful use of the power of his office by a judge acting intentionally, or with gross unconcern for his conduct, and generally in bad faith. It involves more than error in judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude, dishonesty, or corruption and also any knowing misuse of the office whatever the motive. However, these elements are not necessary to a finding of bad faith. A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith ... Willful misconduct in office of necessity is conduct prejudicial to the administration of justice that brings the judicial office into disrepute. However, a judge may also, through negligence or ignorance not *191 amounting to bad faith behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute.
(emphasis added); see also Chinn, 611 So.2d 849 (Miss. 1992); In Re Quick, 553 So.2d 522 (Miss. 1989) (case where justice court judge was removed from office after adjudicating approximately 28 driving under influence convictions and 552 routine traffic convictions without reporting them to the Department of Public Safety); In Re Baker, 535 So.2d 47 (Miss. 1988) (case where a judge called a litigant involved in a pending action soliciting his political support.)

A. THE MATTER OF GRACE BAPTIST CHURCH
The Commission asserts that Dodds acted unlawfully in the matter of Grace Baptist Church when Dodds issued a temporary restraining order against the pastor without any legal authority and without any notice or opportunity to be heard given to the pastor. The Commission further asserts that Dodds acted unlawfully when he had the pastor arrested pursuant to the temporary restraining order which he had no opportunity to challenge for a period of at least 60 days; and also acted unlawfully when he responded personally to the November 4, 1992, incident at the church after which he continued as a judge in the case and extended his unlawful restraining order.
The Commission argues that a justice court judge has no authority to issue a restraining order except in specific circumstances of domestic abuse, and thus, Dodds had absolutely no authority to have the pastor arrested pursuant to that order. The Commission asserts that Dodds knew or should have known his actions were beyond the legitimate exercise of his authority and contends that Dodds even admitted to acting outside his judicial authority at trial. The Commission contends that Dodds' conduct constitutes bad faith, willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute as defined by this Court in In Re Anderson, 412 So.2d at 745.
The Commission further argues that Dodds' defense that he did not know that he did not have the authority to issue the restraining order and arrest the pastor is without merit as ignorance of the law is no excuse for justice court judges. Chinn, 611 So.2d at 853; see also In Re Bailey, 541 So.2d 1036, 1039 (Miss. 1989).
In Chinn, this Court removed a justice court judge for ticket fixing, failure to sentence criminals in accordance with statute, dismissal of misdemeanor cases in violation of statute and interference with the rotation of cases assigned to other judges in attempt to influence other judges. Chinn, 611 So.2d at 849. Recognizing that Judge Chinn possessed only a high school education and had no formal legal training, this Court quoted from In re Collins, 524 So.2d 553 (1987) as follows:
[Any] claim of ignorance of the duties of his office or negligence in carrying out those duties as a defense to judicial misconduct is tantamount to an admission by an accused judge that he does not possess the qualifications necessary to hold the office to which he has been elected.
Chinn, 611 So.2d at 856. This Court further reasoned "it seems logical to impute knowledge of the statutes to judicial officers in a decision making position ... Judge Chinn should not be able to hide behind his lack of diligence in reading and interpreting the applicable statutes. The statutes concerning justice court are not too voluminous that a judge could not comprehend them, given a reasonable effort." Id.
The Commission also argues generally, without any support or analysis, that Dodds' conduct regarding the church violated Canons 1, 2A, 2B, 3A(1), 3A(2), 3A(3), 3A(4) and 3C. (see Attachment I for language of Canons.)
Dodds contends that although he may have taken actions in excess of his authority, he was attempting to interpret the wording of the Commission pamphlet concerning peace bonds, restraining orders and protective orders. He contends that there was no clear and convincing evidence that he acted in bad faith in his actions, and asserts that he simply misinterpreted the law by not following *192 the proper procedures in handling a very complicated situation. He asserts that he was trying to handle a first-time situation during his first year of office that was overwhelming to him and even sought advice from Rick Patt with the Judicial College and from the Attorney General's office.
Dodds freely admits that many of his actions concerning the church situation were a mistake due to errors of judgment, lack of diligence and misinterpretation of law, but argues he did not reach legal conclusions or apply the law as he understood it based on fraud, corrupt motive or bad faith as required by Rule 2 of the Rules of the Mississippi Commission on Judicial Performance regarding the jurisdiction of the Commission. Said rule provides:
The Commission shall consider conduct of a judge or the physical or mental condition of a judge. In the absence of fraud, corrupt motive or bad faith, the Commission shall not consider allegations against a judge for making findings of fact, reaching a legal conclusion, or applying the law as he understands it.
It is apparent that Dodds is essentially arguing that he did not engage in willful misconduct, bad faith or corruptive behavior so as to entitle the Commission to have jurisdiction over this case. However, his argument is without merit. In Chinn, Anderson, and Bailey this Court held that neither moral turpitude, dishonesty, nor corruption are necessary for a finding of bad faith. According to said cases, specific intent to use the powers of the judicial office to accomplish a purpose which Dodds knew or should have known was beyond the legitimate exercise of his authority constituted bad faith on his behalf.
Dodds should have known the limits of his authority. As the Commission found, the evidence reveals that he issued a temporary restraining order against Reverend Owens without notice and had him arrested on several occasions pursuant to that warrant. The restraining order was in affect for a period of at least sixty days, affording no opportunity for Owens to challenge it.
In addition, evidence reveals that Dodds participated in other conduct which brought the administration of justice into disrepute, consisting of going to the church during one of the disturbances, and refusing to allow Owens to press charges against church members as a result of one of the disturbances.
The Commission's finding that Dodds' actions in the matter of Grace Baptist Church constituted willful, or at least negligent, misconduct is supported by clear and convincing evidence.

B. ACCEPTANCE OF MONEY WITHOUT LEGAL AUTHORITY
The Commission argues that Dodds engaged in a pattern on accepting fine money directly from litigants. Furthermore, in the cases of Timothy Ashmore, Diane Ashmore, Willis, and Walker Mayhall, Dodds loaned money to the defendants to post bond.
In Miss. Jud. Perf. Com'n v. A Justice Court Judge, 580 So.2d 1259 (1991), this Court held that private reprimand was appropriate for a judge who collected $4,168.75 in fine money on 46 occasions and 55 separate cases in lieu of the court clerk where there was no allegation that he intended to or attempted to keep the money. This Court recognized that in 1984 the legislature created justice court clerks in each county who have the duty of collecting and accounting for all fines. Miss.Code. Ann. § 9-11-19 (Supp. 1990). This Court reasoned:
We cannot say that it is absolutely wrong for a justice court judge to personally accept fine monies, because it is not expressly forbidden by statute. On the other hand, the statutes do not authorize it any more than they authorize a circuit judge to personally receive fine monies in his court, or a chancellor to personally receive public monies in his. There is clear legislative intent to remove justice court judges from the collection of fines. Only the justice clerk has the statutory authority to collect fines, give receipts for fines, and account for all fine monies paid to the county ... . .
This Court therefore makes the following admonition to justice court judges insofar as individually accepting fine monies: Don't... .

*193 [I]t should only be in some isolated and clearly necessitous circumstance that a justice court judge ever undertake the responsibility himself of receiving any fine money. If that extreme occasion arises, he must give a written receipt, keep the money segregated and apart from his own, and at the very first opportunity deliver it to the justice court clerk with an explanation of why he received it himself.
Dodds takes exception to the Commission's argument that he made it a practice to handle money when the proof only shows that he handled money on approximately seven cases out of a several thousand cases. He argues that receiving envelopes addressed to him, finding money in them, and turning it over to the clerks is not a practice of handling money. He argues that neither is transferring money from a defendant's mother to the jailer such a practice such as in the Randy Hale case. Dodds distinguishes his acceptance of money from that involved in A Justice Court Judge. Dodds argues that in that case, the judge accepted $4,168.75 on 46 occasions and 55 separate cases, whereas the money involved in his case only amounted to a few hundred dollars on approximately seven occasions. He argues that he did not make it a practice to accept money, and realizes that he is not supposed to handle money.
Dodds takes exception to the Commission's argument that he loaned money to Timothy and Diane Ashmore. He argues that the father, Clyde Hopkins, gave him a check for the amount needed to post bond for them and he gave Hopkins the cash money. Thus there was no loaning of money in the Ashmore case. Dodds admits loaning bond money to Willis, and Mayhall, but argues that he was acting with a sense of fairness and compassion. He argues that he exercised leniency to people of very modest means and circumstances of which he expected no political return or benefit. See A Justice Court Judge, 580 So.2d at 1263, wherein this Court reasoned that the judge exercised leniency and compassion to people of modest means when he dismissed traffic cases for improper tag or license.
It is apparent from this Court's holding in A Justice Court Judge that it is improper for a justice court judge to handle money pursuant to Miss. Code Ann. § 9-11-19 (Supp. 1990). Dodds denies taking funds in the cases of Theresa Ballard and David Moore, admits taking funds in the Randy Hale case, and neither recalls the Wyatt case, the Martin case, nor the Drake case where his own signature was found on the receipt. As he admits to receiving Hale's bond and offers no testimony to refute the Commission's findings in the Wyatt, Martin, and Drake cases, the Commission's findings must stand. Dodds' handling of fine money, although limited to a few occasions, was improper. Furthermore, although there is no evidence that Dodds materially benefited from his collection of fine money, "it is easy for the misdemeanor offender who pays a fine to the justice court judge individually to get it into his head that the judge has a personal interest in the fine money." A Justice Court Judge, 580 So.2d at 1262.
In effect, the present case is more serious to the administration of justice than A Justice Court Judge. In that case, the judge only received fine money, in the present case, Dodds not only received fine money, but also admitted to loaning bond money to defendants Willis and Mayhall.
Because Dodds' behavior was more serious than A Justice Court Judge, we conclude that Dodds' actions constituted willful, or at least negligent, misconduct which he knew or should have known was beyond the legitimate exercise of his legal authority. Thus, the Commission's finding of misconduct is supported by clear and convincing evidence.

C. EXECUTION OF JUDGMENT
The Commission contends that Dodds acted outside his legal authority and violated Canons 1, 2A, 2B, 3A(1) and 3A(2) when he signed a December 10, 1992, execution of judgment for a litigant who obtained a default judgment in Justice Court. The Commission argues that after a justice court clerk refused to sign a blank execution of judgment because no court costs had been paid, Dodds signed the form and had it notarized by a deputy court clerk. The Commission *194 argues that the execution was never filed with the circuit clerk. Thereafter, the Commission asserts that the execution was delivered to the Prentiss County Sheriff's office at which time Dodds' name had been scratched out.
Dodds asserts that although he signed the execution after the justice court clerk refused to sign it, he crossed his signature out after the county attorney advised him on proper procedures for executing a judgment. He asserts that after being so advised, he gave the writ to the litigant who then took it to the circuit clerk's office. The litigant, thereafter, took it to the sheriff's office with Dodds signature crossed out and the sheriff's office served the execution. Thus, Dodds argues that the evidence was not clear and convincing that he acted in bad faith or with gross unconcern for his conduct as his only involvement with the writ was calling the county attorney and turning the matter over to the circuit clerk.
It appears that the evidence conflicts as to whether Dodds signature was present, and not crossed out, when the circuit clerk notarized the writ of execution. It is uncontradicted that Dodds' signature was crossed out when it reached the sheriff's office to be served. Testimony by circuit clerk Janelle Lowrey indicates that Dodds' signature was not crossed out when she notarized his signature prior to the form being taken to the sheriff's office. She further testified that no documents were filed at the circuit court and no court fees were collected from the litigant.
As the Commission's finding that Dodds signed a execution of judgment without authority and without court costs being paid is supported by the evidence, Dodds acted outside the legal authority of a justice court judge.

D. IMPROPER HANDLING OF DUI CHARGES
The Commission argues that on February 18, 1992, Dodds allowed a defendant originally charged with driving while his license was suspended and driving under the influence, second offense, to plead to lesser charges of possession of beer and whiskey. The Commission argues that Dodds did not possess the lawful authority to reduce charges of DUI, and furthermore, did not possess the authority to do so without an underlying affidavit. The Commission asserts that Dodds' actions violated Canons 1, 2A, 2B and 3A(1).
Dodds argues that he reduced the charges in this matter because the prosecuting attorney informed him that the evidence was not clear as to whether the defendant was driving and that he had an agreement with the defendant to pay fines on the lesser charge. Dodds recognizes that he should have made an adjudication of not guilty in the matter based upon the proof, but argues that the evidence is not clear and convincing that he improperly handled the matter to the extent of it being willful misconduct.
Dodds further argues that new affidavits were not made in the matter because the deputy who handled the situation left court prior to making a new affidavit, and he expected his clerks to handle the matter.
In Chinn, this Court held that "[t]he statutes do not allow a justice court judge to reduce a DUI to reckless driving." Chinn, 611 So.2d at 853. Furthermore, this Court held that ignorance of the law is no defense for justice court judges. Id. at 853.
Similar to this Court's holding in Chinn that the statutes do not allow for reduction of a DUI offense to reckless driving, there is nothing in the statutes that allows for the reduction of DUI to a charge of possession of beer and whiskey. Furthermore, § 63-11-39 of Miss. Code Ann. (Supp. 1992) specifically provides that neither the court nor the prosecutor shall "reduce the charge of driving under the influence of intoxicating liquor to a lesser charge for any person whose blood is shown to contain ten one-hundredths percent (.10%) or more by weight volume of alcohol by a chemical analysis of the person's breath or blood." The evidence shows that the defendant had a blood alcohol level of.14%. Thus, Dodds acted beyond his legal authority when he permitted a guilty plea for the lesser charge.
Although Dodds claims that he reduced the charges because the county attorney requested that he do so, Dodds, as a justice *195 court judge, is imputed with the knowledge of the statutes and should have known that such a reduction was improper. The Commission's finding of misconduct is supported by clear and convincing evidence.

E. THE PRACTICE OF TICKET FIXING
The Commission contends that between April 6, 1992, and March 11, 1993, Dodds engaged in substantial acts of ticket fixing whereby approximately thirty-two cases were disposed of by dismissal or not guilty verdicts. The Commission further contends that these cases were the result of ex parte conversations and were not resolved in open court as required by law. The Commission argues that Dodds' practice of ticket fixing violates Canons 1, 2A, 2B, 3A(1) and 3A(4). Furthermore, it is willful misconduct in office and conduct prejudicial to the administration of justice as defined by this Court in Chinn, 611 So.2d at 849.
In Chinn, the judge, without a trial, dismissed cases and noted "not guilty" on tickets where defendants were charged with speeding violations and non-moving violations such as having an expired license, inspection sticker or tag. Chinn, 611 So.2d at 851. Imposing the sanction of removal after reviewing all of Chinn's actions, this Court held that Chinn's ticket fixing activities violated Canons 3A(1) and 3A(4) and further held:
Procedurally speaking, a court cannot dismiss a case on it's own volition. A hearing must be conducted unless the prosecuting attorney moves to dismiss the case. This Court has taken a firm stance on ticket fixing. In the case of In re Hearn, 542 So.2d 901 (Miss. 1989), the Court removed justice court Judge Ralph Hearn from the bench for his continued practice of fixing tickets. Two years earlier, Judge Hearn was publicly reprimanded and fined for engaging in the same conduct. In re Hearn, 515 So.2d 1225 (Miss. 1987). The procedure which Judge Hearn used was exactly the same as that of Judge Chinn. The dismissals were the result of ex parte communications with no hearings being conducted, and the tickets were marked with "not guilty" rather than dismissed.
Chinn, 611 So.2d at 852.
This Court also imposed sanctions for the practice of ticket fixing in Miss. Com'n on Jud. Perf. v. Gunn, 614 So.2d 387 (Miss. 1993). In that case, this Court held a public reprimand and a fine were appropriate sanctions where a judge dismissed eight tickets without conducting a trial and dismissed two speeding violation cases assigned to another judge.
In In re Seal, 585 So.2d 741, 745 (Miss. 1991), this Court held that a public reprimand and a fine were appropriate for a justice court judge who allowed patrol officers and/or the justice court clerk to adjudicate approximately 102 traffic ticket cases, and who dismissed fourteen moving and non-moving cases by marking not guilty upon the court record without a trial and upon ex parte communications.
In Jud. Perf. Com'n v. Cowart, 566 So.2d 1251 (Miss. 1990), this Court held that public reprimand and a fine were appropriate sanctions where the judge had an "unwritten policy whereby defendants charged with non-moving traffic violations such as "no drivers license," "no tag," and "no inspection ticket" would have the charges dismissed if the defendant exhibited to the court and/or justice court clerk or deputy clerk evidence of having cured the deficiency." Cowart, 566 So.2d at 1252. The judge dismissed approximately 30 cases in this manner by verdict of not guilty.
Dodds takes exception to the Commissions assertion that he engaged in thirty-two counts of ticket fixing, as the record indicates that no proof was presented in three of the cases. Dodds asserts that the remaining 29 cases involved non-moving violations such as expired tags, switched tag, improper license, improper equipment and failure to dim lights. He asserts that although he disposed of the cases through ex parte communications, he only did so because the court had thousands of cases to handle and the county attorney advised him to dispose of the cases in that manner.
*196 Furthermore, Dodds asserts that of the 29 cases, three were dismissed because the officer who issued the tickets committed suicide. In addition, Dodds asserts that a speeding ticket issued to Bobby Chittom was dismissed because it was the court's practice to send minors who were first time offenders to driving school. He further argues that the speeding ticket issued to Karen Grisham was dismissed pursuant to the highway patrolman's request.
Dodds realizes that the manner in which he handled the cases was improper and asserts that he has taken steps to correct court procedures by issuing an order addressing the problem of ex parte communications and the avoidance of handling cases outside of court.
Dodds distinguishes the case sub judice with Cowart by arguing that unlike Cowart, he heard all of the cases himself and considered all the documentation in the cases. Furthermore, he asserts that the ticket fixing charges in A Justice Court Judge, where the judge fixed seventy-four tickets, and the charges in In re Seal, where the judge engaged in one hundred-two cases of ticket fixing, are far more numerous and serious than the twenty-nine cases alleged against him, and, those judges only received sanctions of public reprimand. Dodds contends that there is no clear and convincing evidence that he engaged in willful misconduct, as he asserts that his only motive in dismissing the cases was to handle the large caseload.
While Dodds may be correct in his assertion that the ticket fixing allegation against him only encompasses twenty-nine cases, as the Commission entered a stipulation at trial that no evidence would be presented in three cases, and thus does not amount to the numerous violations alleged in A Justice Court Judge and In re Seal, such an analogy makes his case no less violative of the law. Contrary to Dodds' contention, there is clear and convincing evidence that he engaged in ticket fixing. In virtually all of the cases, Dodds stipulated that the cases were not heard in open court and were dismissed based upon evidence brought to his attention indicating that the deficiencies were cured. Such actions have been held to be unlawful ticket fixing. See Cowart and Chinn.
Although Dodds asserts that the cases were dismissed because of the court's large case load and pursuant the county attorney's advice, in A Justice Court Judge, In re Seal, Cowart, Gunn, and Chinn, this Court definitively held that the practice of ticket fixing by way of dismissal of cases without trial is unlawful and is deserving of sanctions. Thus, the Commission's finding that Dodds engaged in ticket fixing constituting misconduct is supported by clear and convincing evidence.

F. INTERFERENCE WITH THE ROTATION OF CASES
The Commission contends that on at least forty occasions between February of 1992 and January of 1993, Dodds adjudicated cases assigned to Judge Caver, the other Prentiss County Justice Court Judge, in violation of Miss. Code Ann. § 9-11-27, which provides that all cases shall be assigned by the clerk to the justice court judges, and § 99-33-2, which provides that in criminal matters, the clerk shall assign all criminal cases to the justice court judges in the county on a rotating basis to ensure equal distribution of the cases among the judges of the county. The Commission argues that the practice of adjudicating Judge Caver's cases, coupled with Dodds' tendency to engage in ex parte communications, promoted forum shopping throughout Prentiss County.
The Commission further argues that on one occasion, Dodds procured a court file relating to his son Charles Dodds, who was charged with having an expired tag on his car. The Commission argues that Dodds presented the case to Judge Caver, who suspended the fine. In another case, the Commission contends that Dodds successfully urged Judge Caver to dismiss a speeding ticket for his son's friend Warren McMillian. Dodds' intercession on behalf of his son and McMillan, asserts the Commission, violated Canon 2B which prohibits attempts to influence another judge.
Dodds argues that he and the Commission stipulated that he handled twenty-six cases assigned to Judge Caver, thus he takes exception *197 the Commission's asserted that he handled forty such cases. Dodds admits that he handled cases assigned to Judge Caver, but asserts that it was the practice of both judges to handle the other's cases either when one was unavailable to the litigant. Dodds argues that his contention is supported by justice court clerk, Bobbie George, who testified that both judges made it a practice of handling each others cases. Dodds also contends that he was advised to do so by the county attorney in order to handle the caseload.
In addition, Dodds contends that he never influenced Judge Caver with respect to cases involving his son or McMillian. He argues that he asked Judge Caver to handle his son's case because he was originally assigned the case and it was improper for him to handle it, but did nothing more than that. Furthermore, he argues that he neither talked to McMillian nor Judge Caver concerning McMillian's ticket.
The Commission's argument that Dodds interfered with the rotation of cases is without merit. Although Miss. Code Ann. § 9-11-27 provides that all cases shall be assigned to judges by justice court clerks, it is apparent that Dodds did not willfully interfere with rotation of cases so as to create forum shopping or violate the Canons as it was the practice of both judges at the court to handle cases for each other when the other was unavailable. Furthermore, this Court has never interpreted either § 9-11-27 or § 99-33-2 as prohibiting judges from handling each others cases when a judge is unavailable. Thus, Dodds did not interfere with the rotation of cases assigned to other judges so as to warrant sanctions.
In Chinn, upon learning that he was not assigned a particular case, Judge Chinn asked another judge to give the case "consideration." Chinn, 611 So.2d at 854. This Court held that the attempt to influence other judges is a violation of Canon 2B. Citing Miss. Jud. Perf. Com'n v. Peyton, 555 So.2d 1036, 1038 (Miss. 1990), this Court further held that "the penalty for a judge seeking favorable treatment for a person charged with a traffic violation is a private reprimand." Chinn at 854. In the case sub judice, there is no clear and convincing evidence that Dodds attempted to influence Judge Caver in any manner with respect to his son's speeding ticket. Dodds testified that because the case involved a close relative, he recused himself from the case and asked Judge Caver to handle it. There was no evidence presented that Dodds asked Judge Caver to do anything else. Similarly, there was no evidence presented that Dodds attempted to influence Judge Caver in the adjudication of the McMillian case. Although Dodds argues that he neither talked to Judge Caver nor McMillian regarding the case, and McMillian contradicted Dodds by testifying that he spoke to Dodds to find out who would be the judge in his case, no evidence was presented that Dodds attempted to influence Judge Caver in the case, and McMillian's discussion with Dodds is insufficient to support such a finding.
The Commission's findings that Dodds interfered with the rotation of cases and attempted to influence Judge Caver are unsupported by the evidence.

G. EX PARTE COMMUNICATIONS
The Commission argues that Dodds engaged in a widespread practice of ex parte communications when cases were submitted to him for resolution. The Commission asserts that the charges arising against him including the matter of Grace Baptist Church, handling and loaning money, acting outside his legal authority to sign an execution of judgment, the practice of ticket fixing, and interference with the rotation of cases all arise from Dodds' practice of engaging in ex parte communications.
The Commission further notes that on at least seven occasions, Dodds reduced defendants' fines from the standard fines based upon ex parte communications. On another occasion, the Commission points out that Dodds met ex parte with a defendant's wife and accompanied her to jail, whereupon Dodds negotiated a plea agreement directly with the defendant without the presence of either the county prosecutor or the defendant's attorney. The Commission contends that Dodds' practice of engaging in ex parte communications is judicial misconduct as held *198 by Gunn, 614 So.2d at 389 (Miss. 1993) and violates Canons 3A(1) and 3A(4) as held in Chinn, 611 So.2d at 852.
In Gunn, a caller specifically asked to speak to Judge Gunn concerning a ticket. Gunn, 614 So.2d at 389, Judge Gunn accepted a guilty plea over the phone and quoted a fine to the caller which was fifteen dollars less than the normal fine. This Court condemned the judge's participation in ex parte communications pursuant to this Court's holding in Chinn and held that once Judge Gunn found out the nature of the call, he should have transferred the call to the clerks office for them to handle.
In Chinn, this Court held that Judge Chinn's participation in ex parte communications resulting in the dismissal of cases without hearings violated Canon 3A(1) and Canon 3A(4). In regards to Chinn's ex parte phone conversations, this Court held:
[T]his Court realizes that is difficult not to have ex parte communications because judges do not know the nature of their calls when they answer the phone. However, this problem can be alleviated by using clerks to screen calls, inquiring whether they pertain to a matter presently pending before the court. If so, the call could be directed to the county attorney, thereby avoiding any ex parte communications. For a judge to merely listen to another person involved in pending litigation is a violation of Canon 3 A(4).
Chinn, 611 So.2d at 852. Dodds candidly admits his involvement in ex parte communications. However, he argues that he had no bad motive in engaging in such practices and cites three cases wherein he reduced fines based upon the financial difficulties of the parties. Dodds further argues that the bulk of the cases wherein he engaged in ex parte communications occurred during his first year of office  a time when he was inexperienced and acting upon past practices as advised by the county attorney and engaged in by the other justice court judge. He realizes that judicial engagement in ex parte communications is wrong and he and Judge Caver have entered an order to prevent these situations from reoccurring.
In Gunn and Chinn, this Court condemned judicial engagement in ex parte communications and held that it violates Canons 3A(1) and 3A(4). The evidence supports the Commission's contention that Dodds' misconduct in the matter of Grace Baptist Church, handling and loaning money, signing an execution of judgment without authority, and the practice of ticket fixing all arise from Dodds' unlawful engagement in ex parte communications; and Dodds candidly concedes to this contention. Dodds' contention that he did not possess any bad motives and engaged in the practice in order to accord fairness to the litigant does not make Dodds' practice any less violative of this Court's holdings in Gunn and Chinn. Nor are his actions less violative of Canon 3A(1), which calls for unswayed partiality on behalf of judges and Canon 3A(4), which prohibits ex parte or other communications concerning a pending or impending proceeding.
Thus, the Commission's finding that Dodds engaged in misconduct by engaging in ex parte communications is supported by clear and convincing evidence.

H. OBSTRUCTION OF THE JUDICIAL PROCESS
The Commission contends that Dodds obstructed the judicial process after being served with a formal complaint by the Commission. The Commission argues that Dodds' obstruction is evidenced by the circulation of his April 30, 1993, order to the Constables and members of the justice court staff demanding that they deliver official and unofficial notes and evidence relating to the cases and allegations against him. Furthermore, obstruction is evidenced by Dodds' language in the order that failure to abide by his orders would constitute grounds for punishment for contempt. The Commission argues that although Dodds never executed on the order, the order was nonetheless an attempt to knowingly and intentionally intimidate the staff in the performance of their duties and as potential witnesses against Dodds.
The Commission further argues that Dodds' actions constituted bad faith, and willful misconduct as he used the power of his *199 office to accomplish a purpose that he knew or should have known was beyond the legitimate exercise of his authority. The Commission also argues that Dodds' actions violate Canons 1, 2A, 2B and 3A(1).
Dodds contends that his order was never intended to obstruct the judicial process or to obstruct the investigation of the Commission, as he was only trying to obtain access to the files in order to prepare a defense to the complaint filed against him. He argues that the order was issued out of anger at the security measures implemented in the office, as he previously had access to the files twenty-four hours a day. He further argues that the county attorney drafted the order and much of the language concerning contempt was inadvertently entered in the order, as evidenced by the county attorney's affidavit.
Mississippi Code Ann. § 9-19-21 provides that the commission is entitled to compel the attendance and testimony of witnesses and to provide for the inspection of documents, books, accounts and other records.
Dodds' order of April 30, 1993, can clearly be interpreted as an obstruction of justice as alleged by the Commission. The contempt language in the order as well as Dodds' demand to turn over all official documents and unofficial personal notes could clearly be read as purposefully and intentionally attempting to intimidate employees as witness' against him in contravention of § 9-19-21. Furthermore, although Dodds contends that the county attorney mistakenly placed contempt language in the order, that he did not act upon the order, and that he wished to gain access to documents he previously had access to around-the-clock, the order was nonetheless signed by Dodds and distributed with the intention of intimidating court personnel to turn over relevant documents and could be read as intimidating court personnel with respect to their involvement in the case. Such actions cannot be condoned by this Court. Dodds knew or should have known that these actions were beyond his legal authority.
The Commission's finding that Dodds' order of April 30, 1993, was an obstruction of justice, and thus was willful misconduct which brought the administration of justice into disrepute is supported by the evidence.
When considered summarily, Dodds' actions in the matter of Grace Baptist Church, accepting and loaning money without legal authority, signing an execution of judgment without legal authority, improperly handling DUI charges, engaging in ticket fixing, engaging in ex parte communications, and obstructing the legal process clearly constitute willful misconduct, or at the least bad faith, prejudicial to the administration of justice as set forth by Article 6, Section 177A of the Mississippi Constitution (1890), as amended. Bad faith prejudicial to the administration of justice so as to bring the judicial office into disrepute was defined by this Court in In Re Anderson, Chinn, In Re Quick and In Re Baker as "specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority." In Re Anderson, 412 So.2d at 745.
Dodds knew, or should have known, that many of his actions such as engaging in ex parte communications, dismissing cases without trial, and engaging in ticket fixing were beyond his legitimate authority, as there was definitive case law on all of these issues. Furthermore, Dodds' defense of ignorance and lack of understanding of the law during his early years as a justice court judge is of no avail to him, as this Court has held that a judge may behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute through negligence or ignorance not amounting to bad faith. Id.
As eloquently stated by this Court in In re Bailey:
There are good reasons why our justice court judges must regard scrupulously the nature of their office. In the first place, most of our citizens have their primary, if not their only, direct contact with the law through the office of the justice court judge. See In Re Garner, 466 So.2d 884, 887 (Miss. 1985). The perception of justice of most of our citizens is forged out of their experiences with our justice court judges. If these judges do not behave *200 with judicial temperament and perform their duties according to the law and by reference to the process of adjudication, there seems little hope that our citizenry at large may understand and respect the legal process.
Some say this is unrealistic, that our justice court judges for the most part have no formal training in the law. No doubt these public servants are at a disadvantage. The people have insisted only that each shall be a "high school graduate or have a general equivalency diploma." Miss. Const. Art. 6, Section 177A (1890), as amended. Yet the time is at hand when we insist that our justice court judges be nothing less than that  judges.
When a person assumes the office of justice court judge in this state, he or she accepts the responsibility of becoming learned in the law. When such a person takes the oath of office, he or she yields the prerogative of executing the responsibilities of the office on any basis other than the fair and impartial and competent application of the law to the facts. The preservation of the rule of law as our last best hope for the just ordering of our society requires nothing less than an insistence by this Court that our justice court judges be in fact what they are in name: judges. See McCommon v. State, 467 So.2d 940, 944-45 (Miss. 1985); Lockett v. State, 517 So.2d 1317 1322-23, 1341-42 (Miss. 1987).
In Re Bailey, 541 So.2d at 1039.
The Commission's contention that Dodds' conduct constituted willful, and at the least negligent, misconduct prejudicial to the administration of justice so as to bring the judicial office into disrepute is supported by the evidence.

II. SHOULD DODDS BE REMOVED FROM OFFICE PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION?
The Commission recommends that Dodds be removed from office and assessed the costs of this proceeding as a form of judicial discipline and sanction. The Commission asserts that its authority to recommend removal is granted in the Mississippi Constitution of 1890 section 177A, as amended, which provides that upon recommendation of the Commission, a judge may be removed, suspended, fined, publicly censured or publicly reprimanded.
The Commission contends that the sanction imposed should be consistent with like cases and should fit the offense. In re Bailey, 541 So.2d at 1039. The Commission recognizes that it must consider mitigating factors when determining appropriate judicial sanctions pursuant to this Court's holding in In Re Baker, 535 So.2d 47 (Miss. 1988), and Miss. Jud. Perf. Com'n v. Walker, 565 So.2d 1117 (Miss. 1990). Such factors include:
(1) the length and character of the Judge's public service;
(2) positive contributions made by the judge to the court and the community;
(3) the lack of prior judicial precedent on the incident in issue;
(4) commitment to fairness and innovative procedural form on the part of the judge;
(5) the magnitude of the offense;
(6) the number of persons affected;
(7) whether moral turpitude was involved.
The Commission contends that there is judicial precedent for virtually every act of misconduct committed by Dodds, yet he committed them anyway. It contends that the offenses were serious and he was guilty of over seventy-five separate acts of misconduct, each involving multiple persons and affecting all of Prentiss County.
The Commission further contends that the practice of ticket fixing has lead to the removal of justice court judges in the past, and should be sufficient to remove Dodds from office in the present case. See Chinn, 611 So.2d at 857.
The Commission also alleges that Dodds' issuance of a restraining order in the matter of Grace Baptist Church without legal authority is similar to the abuse of contempt powers for which a justice court judge was publicly reprimanded in Walker, 565 So.2d at 1117 (Miss. 1990) (case wherein judge's actions constituted willful misconduct after holding a litigant in contempt of court and sentencing him to 24 hours in jail without *201 bond for addressing a racial slur to judge in open court and commenting on his right of appeal. Racial remark was held to be a personal attack on judge and not directed at the court.)
The Commission argues that the totality of Dodds' aforestated misconduct, in addition to other misconduct including accepting money without legal authority, signing an execution of judgment without legal authority, improper handling of DUI charges, interfering with the rotation of cases, engaging in ex parte communications, and obstructing the judicial process clearly evince an unfitness for the judicial office and necessitate removal as in prior cases decided by this Court. See Chinn, 611 So.2d at 849; In re Hearn, 542 So.2d 901 (Miss. 1989); In Re [William] Anderson, 451 So.2d 232 (Miss. 1984); In Re [Lloyd] Anderson, 412 So.2d 743 (Miss. 1982); and Miss. Com'n on Jud. Perf. v. Coleman, 553 So.2d 513 (Miss. 1989).
Dodds asserts that his length and character of public service as well as his positive contributions made to the court and community should be considered when determining sanctions.
Dodds asserts that he is 68 years old; has been married for 49 years and raised eleven children, one boy being killed in service in Vietnam. He finished the third grade and thereafter went to the service wherein he received a purple heart and five battle stars commending his efforts in the Battle of the Bulge on D-Day in France. He is active in the VFW and American Legion. After the service, he completed his education, and has operated a business for the last 42 years. He was appointed to the Office of Justice Court Judge in October 1991 by the Board of Supervisors.
To exemplify the length and character of his public service and positive contributions to the community, Dodds directs the Court's attention to an affidavit from Prentiss County lawyers. Dodds alleges that in said affidavit, the attorneys speak highly of him stating that
he was honest and fair to all sides, that he was a competent judge, that he was respectful and courteous, that he maintained a high regard to the administration of justice, that he was a hard-working and diligent public official, that he exhibited excellent judicial temperament, that he was a patriot and civic minded and promoted the best interest in the community.
He further cites the testimony of Wade Lambert, Mayor of the City of Booneville, wherein he stated:
Mr. Dodds, in my opinion has always been a model citizen, someone that you would like to pattern your life after because he reared a large family, was a good businessman, and he was known as a person who was trustworthy, a person that you could depend on, an accommodating person always helpful in his community.
Dodds' traits of good character, as witnessed by the lawyers of Prentiss County, as well as his patriotism and hard-working qualities are substantially outweighed by his unlawful actions in office. In Chinn, this Court removed Judge Chinn from office based upon four areas of misconduct including his interference with the rotation of cases assigned to other judges in attempt to influence other judges, practice of ticket fixing, failure to sentence criminals in accordance with statute, and dismissal of misdemeanor cases contrary to statute. Dodds engaged in the latter three of the activities engaged in by Chinn. The case against Dodds, however, is stronger than that against Chinn in that Dodds also accepted money without legal authority, engaged in ex parte communications, signed an execution of judgment without legal authority, and obstructed the judicial process; Dodds thereby engaged in seven different areas of judicial misconduct. In addition, there was prior definitive judicial precedent on many of the issues in question, and many of Dodds' actions were engaged in on numerous occasions and affected many people.
Based on the totality of the circumstances, we conclude that Dodds should be removed from the bench and assessed costs as recommended by the Commission.
SULLIVAN, Presiding Justice, for the Court:

III. DOES THE COMMISSION HAVE AUTHORITY TO ACT?
Dodds contends that the Commission has no authority to impose the sanction *202 of removing him from office as Miss. Const. § 177A, which provides for the Commission, has never been approved or cleared by the U.S. Department of Justice as required by section 5 of the Voting Rights Act of 1965. He argues that section 5 requires Justice Department approval prior to implementation of any state enacted rules which affect the ability of people to seek or hold elective office. Dodds relies on Miss. Comm'n on Judicial Performance v. Chinn, 611 So.2d 849, 860 (Miss. 1992), to support his argument.
The Voting Rights Act of 1965 prohibits a state having a history of discriminatory voting practices from imposing any "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" without first seeking preclearance from the federal government. 42 U.S.C. § 1973c. "Mississippi plainly is one of the jurisdictions covered by the statute." Hathorn v. Lovorn, 457 U.S. 255, 265 n. 16, 102 S.Ct. 2421, 2428 n. 16, 72 L.Ed.2d 824 (1982) (citations omitted). The federal government grants preclearance when either the United States Attorney General or the United States District Court for the District of Columbia determines that the proposed change complies with the Act.

The Procedural Bar
Dodds did not raise this issue before the Commission; therefore, it does not appear in the record before this Court. "It is an elementary and familiar rule that [this Court] sit[s] to review actions of the lower courts, and [it] will not undertake to consider matters which do not appear of record in the lower court, absent unusual circumstances." Cossitt v. Federated Guar. Mut. Ins., 541 So.2d 436, 446 (Miss. 1989) (citing Educational Placement Serv. v. Wilson, 487 So.2d 1316, 1320 (Miss. 1986)). See also Patterson v. State, 594 So.2d 606, 609 (Miss. 1992) (citation omitted) (Questions not raised in the lower court will not be reviewed on appeal). This is especially true in disciplinary matters concerning the judiciary since this Court has concluded that in exercising its authority to censure or remove a judge, it "must make [its] own, independent evaluation of the record evidence adduced below ... to make [its] determination of the ultimate action to be taken... ." In Re Anderson, 412 So.2d 743, 746 (Miss. 1982)(emphasis added) (quoting Geiler v. Comm'n on Judicial Qualifications, 10 Cal.3d 270, 110 Cal. Rptr. 201, 203-04, 515 P.2d 1, 4 (1973), cert. denied, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974)). See also In Re Collins, 524 So.2d 553, 559 (Miss. 1987); In Re Brown, 458 So.2d 681 (Miss. 1984). This standard is echoed in Rule 10(E) of the Rules of the Mississippi Commission on Judicial Performance, which states that "[b]ased upon a review of the entire record, the Supreme Court shall prepare and publish a written opinion and judgment directing such disciplinary action, if any, as it finds just and proper."
Such procedural bars appear to withstand federal scrutiny when they are consistently and regularly applied. According to the United States Supreme Court, consistent application of these procedures constitutes an adequate and independent state ground that will bar its review of any federal question. Put another way, "[s]tate courts may not avoid deciding federal issues by invoking procedural rules that they do not apply even-handedly to all similar claims." Hathorn, 457 U.S. at 263, 102 S.Ct. at 2426.[2] Thus, in accordance with these rules, this Court could procedurally bar this matter from review.

The Merits
Notwithstanding the procedural bar, a recent United States Supreme Court case, Presley v. Etowah County Comm'n, 502 U.S. 491, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992), suggests that Miss. Const. § 177A is not subject to the section 5 preclearance requirement of the Voting Rights Act of 1965. The Court first articulated the breadth of section 5 in Allen v. State Bd. of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). There the Court rejected a narrow construction *203 of the Voting Rights Act and held that Congress crafted the Act so that it could reach all state enactments having any impact  major or minor  on the election process.
In Allen the Court examined four separate cases. Those cases involved a change in the procedures for the casting of write-in ballots, changes in the requirements for independent candidates running in general elections, a change from single-district voting to at-large voting, and a statute which provided that officials who in previous years had been elected would be appointed. From those four cases evolved four typologies into which the Court's subsequent section 5 cases fell. Those four typological cases pertain to: (1) changes in the manner of holding elections; (2) changes in candidacy requirements and qualifications; (3) changes in the composition of the electorate that may vote for candidates for a given office; and (4) changes affecting the creation or abolition of an elective office. See Presley, 502 U.S. at 502-03, 112 S.Ct. at 828-29.
The Court continued to broadly construe the Act in its subsequent cases. See Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971); NAACP v. Hampton County Election Comm'n, 470 U.S. 166, 105 S.Ct. 1128, 84 L.Ed.2d 124 (1985); Hadnott v. Amos, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969); City of Richmond v. United States, 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975); McCain v. Lybrand, 465 U.S. 236, 104 S.Ct. 1037, 79 L.Ed.2d 271 (1984); Lockhart v. United States, 460 U.S. 125, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983).
In Dougherty County Bd. of Educ. v. White, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978), the Court appeared to further expand its view of section 5. Dougherty dealt with a county board of education rule requiring employees to take unpaid leaves of absence while they campaigned for elective office. According to the Court, the rule was subject to preclearance because it specifically addressed the election process and operated as an impermissible filing fee, thus burdening those employees who wanted to seek an elective office. Id. at 40, 99 S.Ct. at 373.
In determining that the rule was subject to preclearance, the Court gave "particular deference" to the Unites States Attorney General's broad interpretation of section 5. Id. at 39, 99 S.Ct. at 372-73. Under the Attorney General's regulations, preclearance is required for "[a]ny change affecting the eligibility of persons to become or remain candidates, to obtain a position on the ballot in primary or general elections, or to become or remain holders of elective offices." 28 C.F.R. § 51.13(g). It is this specific language and special acknowledgment that Chinn and Justice Banks use to support their argument that Miss. Const. § 177A is subject to preclearance.
The broad application of section 5 continued until the Court handed down its decision in Presley, supra. Presley concerned two Alabama county commissions that passed resolutions changing their decision-making authority. None of the resolutions enacted by either of the commissions were submitted for section 5 preclearance. The Court, however, held that section 5 did not apply to the resolutions since they did not specifically fall into one of the four categories previously established by Allen, supra, and because each change contemplated by the resolutions did not have a direct relation to voting and the election process. Presley, 502 U.S. at 503, 112 S.Ct. at 828-29.
One of the commissions, the Etowah County Commission, was originally elected under an at-large system. Four of the five commission seats corresponded to residency districts of Etowah County. These residency districts also functioned as four road districts. The commission collectively voted on the division of road funds among the districts; however, each commissioner individually controlled spending within his or her district.
In 1986, pursuant to a consent decree, the commission increased its membership to six members and began electing commissioners on a district-by-district basis rather than an at-large basis. After the decree, a new black commissioner and a new white commissioner were elected to the commission. The other four commissioners were holdovers who had been on the commission before the consent decree.
*204 Following the election of the new commissioners, the commission passed a "Road Supervision Resolution." This resolution essentially kept the old road districts intact, thus foreclosing the new commissioners from exercising any authority over the roads. The new commissioners were to supervise the maintenance of the county courthouse and the engineering department.
The commission also passed a "Common Fund Resolution" that provided for county-wide use of funds for street and road maintenance. This resolution abolished the commission's prior practice of allowing each commissioner to spend money earmarked for his district according to his own discretion.
The Russell County Commission, the other commission involved in Presley, was originally comprised of three at-large members, much like the original composition of the Etowah County Commission. Although major road repair projects and new construction required the approval of the entire commission, each commissioner had individual authority over ordinary road maintenance and repairs in his own district.
Due to various consent decrees and court orders issued between 1972 and 1985, the Russell County Commission's membership was expanded to include seven members, all elected on a district-by-district basis. In 1979, the commission passed a resolution establishing a "Unit System" for its road operations. Under this system, the commission delegated the responsibility for all road operations to the county engineer.
Opponents to the enactment of Etowah County's Common Fund Resolution argued that it was subject to preclearance because "after its enactment each commissioner has less individual power than before the resolution. A citizen casting a ballot for a commissioner today votes for an individual with less authority than before the resolution, and so, ... the value of the vote has been diminished." Id. at 503-04, 112 S.Ct. at 829.
The Court declined to accept this "change in power argument." It noted that whenever a state adopts a new program or modifies an existing one, it will often change the power of an elected official. Such changes, according to the Court, do not necessarily implicate rules governing voting; therefore, lines must be drawn "to confine the coverage of § 5 to its legitimate sphere: voting. Changes which affect only the distribution of power among officials are not subject to § 5 because such changes have no direct relation to, or impact on, voting." Id. at 506, 112 S.Ct. at 830. (emphasis added).
As to the adoption of Russell County's Unit System, the Court determined that the change was not covered by section 5 since it did not fall into any of the four recognized categories of changes in rules governing voting. Although the Court stated that the change closely resembled one affecting the creation or abolition of an elective office, it nonetheless declined to hold that the change was covered by section 5. Since the change did not prohibit voters "`from electing an officer formerly subject to the[ir] approval,'" it did not require preclearance. Id. at 507, 112 S.Ct. at 830 (quoting Allen, 393 U.S. at 570, 89 S.Ct. at 834). The Court went on to add that
[t]he making or unmaking of an appointive post often will result in the erosion or accretion of the powers of some official responsible to the electorate, but it does not follow that those changes are covered by § 5. By requiring preclearance of changes with respect to voting, Congress did not mean to subject such routine matters of governance to federal supervision.
Presley, 502 U.S. at 507, 112 S.Ct. at 830-31.
Perhaps the most significant aspect of Presley is the Court's concern with broadly interpreting the Act. The appellants and the United States, as amicus curiae, relied on the Court's statement in Allen that "`Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way'" to argue that there is no de minimis exception to section 5. Id. at 501, 112 S.Ct. at 827-28 (quoting Allen, 393 U.S. at 566, 89 S.Ct. at 832). The Court did not find this argument to be persuasive, however, because the appellants provided no way to distinguish between those government decisions that involved rules governing voting and those that involved the routine organization and functioning of government.
*205 Also noteworthy is the Court's reluctance to allow the Act to interfere with state autonomy. The Court stated that "[i]f federalism is to operate as a practical system of governance and not a mere poetic ideal, the States must be allowed both predictability and efficiency in structuring their governments." Presley, 502 U.S. at 510, 112 S.Ct. at 832.
The Court also refused to defer to the Attorney General's sweeping construction of the Voting Rights Act as it had in past cases. The Court stated that it only deferred to administrative interpretation of a statute when "Congress has not expressed its intent with respect to the question, and then only if the administrative interpretation is reasonable." Id. at 508, 112 S.Ct. at 831.
The Court went on to address Congress' intent concerning the Act and its own view of the Act's limited applicability. Regarding those matters, the Court stated the following:
We do not believe that in its use of the phrase "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," 42 U.S.C. § 1973c, the statute is ambiguous as to the question whether § 5 extends beyond changes in rules governing voting. To be sure, reasonable minds may differ as to whether some particular changes in the law of a covered jurisdiction should be classified as changes in rules governing voting. In that sense § 5 leaves a gap for interpretation to fill. [citation omitted]. When the Attorney General makes a reasonable argument that a contested change should be classified as a change in a rule governing voting, we can defer to that judgment. But § 5 is unambiguous with respect to the question whether it covers changes other than changes in rules governing voting: It does not. The administrative position in the present cases is not entitled to deference, for it suggests the contrary. The United States argues that the changes are covered by § 5 because they implicate the decision making authority of elected officials, even though they are not changes in rules governing voting. This argument does not meet the express requirement of the statute.
Id. at 509, 112 S.Ct. at 831-32 (emphasis added).
Presley seems to indicate that the Court has adopted "a new category-based approach to define `voting practices' subject to section 5." Nancy C. Zaragoza, Note, Participation Without Representation: The Meaning of the Right to Vote After Presley v. Etowah County Commission, 502 U.S. 491, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992), 67 Wash. L.Rev. 1023, 1032 (1992). Although the Court stated that the Allen categories did not "exhaust the statute's coverage," it did declare that section 5 only contemplates changes that directly relate to voting itself, that is, to rules governing voting and not beyond. This language suggests that Miss. Const. § 177A is not subject to section 5 preclearance because it does not directly relate to voting, nor does it fall within one of the four Allen typologies.
It is possible to analogize the establishment of the Commission on Judicial Performance to the transfers of authority with which Presley dealt; however, the facial appeal of that argument is not ultimately satisfying. Unlike the commissions in Presley, the Legislature, in establishing the Commission on Judicial Performance, did not actually transfer its removal authority, but instead created a separate entity in the judicial branch to discipline the members of the Mississippi judiciary. In fact, the Legislature retained its power of impeachment under Miss. Const. § 49 after the establishment of the Commission on Judicial Performance. Any analogy between the actions of the commissions in Presley and the Legislature is therefore somewhat flawed.
Certainly, one could make the argument that the establishment of the Commission on Judicial Performance had the potential to dilute minority voting strength. But according to the Court, changes that indirectly impact voting are not within the ambit of section 5, "for in a real sense every decision taken by government implicates voting... . [N]o one would contend that when Congress enacted the Voting Rights Act it meant to subject all or even most decisions of government in covered jurisdictions to federal supervision." Presley, 502 U.S. at 504, 112 *206 S.Ct. at 829. Therefore, "only rules governing how one gains office should require preclearance." Zaragoza, 67 Wash. L.Rev. at 1033. Since Miss. Const. § 177A is not concerned with "how one gains office" it should not be subject to the preclearance requirements of section 5.

CONCLUSION
It appears that Miss. Const. § 177A is not subject to the preclearance requirements of section 5 of the Voting Rights Act of 1965. In Presley, supra, the United States Supreme Court held that section 5 only covered changes that directly relate to voting. The four types of changes embraced by section 5 are those affecting: (1) the manner of voting; (2) candidacy requirements and qualifications; (3) the composition of the electorate that may vote for candidates for a given office; and (4) the creation or abolition of an elective office. § 177A does not involve any such changes.
Dodds' reliance on Chinn, supra, is misplaced because Chinn refers to a construction of the Act that extends beyond changes in rules governing voting. Such changes, however, are not contemplated by the Voting Rights Act of 1965.
This assignment is without merit.
AFFIRMED.
PARTS I AND II: PRATHER and SULLIVAN, P.JJ., and PITTMAN and SMITH, JJ., concur.
DAN LEE, C.J., dissents with separate written opinion joined by JAMES L. ROBERTS, Jr., J.
PART III: DAN LEE, C.J., PRATHER, P.J., and PITTMAN, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
BANKS, J., dissents with separate written opinion.
McRAE and MILLS, JJ., not participating.
DAN LEE, C.J., concurring in part and dissenting in part:
Today's majority opinion addresses an issue which I believe is moot and therefore, not properly before this Court. Judge Dodds was not a candidate for reelection in 1995 and left office in 1996. In fact, the majority notes in a footnote that "this case is moot insofar as it requires that [Dodds] leave office." Because I believe it unnecessary to address the removal issue, I dissent in part.
The ultimate decision to discipline a judge has been entrusted to this Court. In exercising that authority and in meeting our responsibility we must make our own, independent evaluation of the record evidence adduced below in each case brought before this Court. In order to answer the question of willful misconduct, a careful inspection must be conducted into the alleged violations committed by each judge in each case. After conducting such a review we then decide whether certain conduct, which we may have found as a fact to have occurred, was "willful misconduct in office" or "conduct prejudicial to the administration of justice that brings the judicial office into disrepute."
It is my opinion that the case sub judice became moot when Judge Dodds left office; therefore, I find no reason to address the issue of removal. In so doing, the majority improperly gives an advisory opinion in which I care not to join.
Accordingly, I respectfully dissent as to the removal issue.
JAMES L. ROBERTS, Jr., J., joins this opinion.
BANKS, Justice, dissenting to Part III.
Because I believe that the constitutional amendment creating a vehicle for the removal of elected judges from office is subject to preclearance and because the failure of the state to seek preclearance for that act jeopardizes the removal decisions of the Judicial Performance Commission, I would stay the action of this Court pending preclearance of the constitutional and statutory scheme creating and prescribing the powers and duties of the Judicial Performance Commission.
*207 Section 5 of the Voting Rights Act of 1965 provides that when a State enacts a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964", the State must obtain preclearance by the United States Attorney General or obtain a declaratory judgment from the United States District Court for the District of Columbia that the enactment does not and will not have the effect of abridging the right to vote on account of race or color.
In 28 C.F.R. § 51.13(g), the Attorney General identified a change affecting voting requiring preclearance as "[a]ny change affecting the eligibility of persons to become or remain candidates, to obtain a position on the ballot in primary or general elections, or to become or remain holders of elective offices". In Dougherty County Board of Education v. White, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978), the Supreme Court approved the Attorney General's § 51.13(g) definition of a matter affecting voting and held that the Attorney General's interpretation of the scope of § 5 of the Voting Rights Act is "entitled to particular deference." Dougherty, 439 U.S. at 39, 99 S.Ct. at 373.
The language of 28 C.F.R. § 51.13(g) was applied in a South Carolina case which is factually similar to the present case. In Tisdale v. Sheheen, 777 F. Supp. 1270 (1991), judgment vacated as moot by Sheheen v. Tisdale, 502 U.S. 932, 112 S.Ct. 366, 116 L.Ed.2d 317 (1991), a state senator was indicted for federal crimes and was suspended from office pursuant to a South Carolina House of Representatives rule requiring suspension of a member upon being indicted of certain crimes. The rule was implemented without the necessary preclearance required under § 5. The court held that the House rule was a standard, practice, or procedure with respect to voting and fell squarely within the plain wording of subsection (g) as it "affects the eligibility of representatives to remain holders of their elective offices." Tisdale at 1274. Although the rule violated the preclearance mandate, the court denied reinstatement of the senator to the House of Representatives upon condition that the State seek preclearance within ten days of the filing of the order. Id. at 1276. During this time period, the court enjoined any future election to fill a seat declared vacant pursuant to the rule. The rule thereafter received preclearance and the injunction was lifted. Id.
Although Tisdale is not binding on this Court, the reasoning of Tisdale should be adopted because the facts in that case are similar to those in the present case and the reasoning is persuasive. Like the senator in Tisdale, Dodds is being removed from a public office pursuant to a State rule (Mississippi Constitution § 177A) that has not received preclearance. We are compelled therefore to hold further action in these proceedings in abeyance for a reasonable period pending an attempt by the Judicial Performance Commission to effect preclearance. If § 177A is precleared, an order of removal will be entered. Should § 177A not be precleared these proceedings should be dismissed.
The majority asserts a procedural bar. I disagree. The Commission on Judicial Performance is not a court of law. Its range of authority is limited to deciding whether to recommend that sanctions be imposed upon judges for misconduct. It has no authority to enjoin its own statutory prerogatives. This is the first court of law in which a claim regarding the Voting Rights Act could have effectively made.
In response to the majority's reliance on an extended analysis of Presley v. Etowah County Comm'n, 502 U.S. 491, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992), I need only point out that nothing in Presley purports to overrule Dougherty concerning the scope of coverage of the act as defined by 28 C.F.R. § 51.13(g).
NOTES
[1] Floyd Dodds was not a candidate for reelection in the 1995 elections and, therefore, left office in January 1996. It follows that this case is moot insofar as it requires that he leave office. We conclude, however, that there are substantial reasons for bringing this matter to a conclusion with a decision on the merits. First, one should not be able to preclude discipline by the simple expedient of resigning or otherwise voluntarily leaving office. See In re the Matter of Weeks, 134 Ariz. 521, 658 P.2d 174 (1983). Additionally, judicial conduct is a matter of great public interest and our decisions serve as a guide for the entire judiciary and to preserve the public confidence in it. Matter of Yaccarino, 101 N.J. 342, 502 A.2d 3, 30-31 (1985); Matter of Probert, 411 Mich. 210, 308 N.W.2d 773, 776 (1981); Judicial Inquiry and Review Bd. v. Snyder, 514 Pa. 142, 523 A.2d 294, 298 (1987).
[2] In Hathorn, the United States Supreme Court did not construe this Court's denial of a petition for rehearing as the silent application of a procedural bar due to the fact that this Court regularly grants petitions for rehearing without mentioning any restrictions on its authority to consider issues raised for the first time in the rehearing petitions.